J-A20002-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA  :   IN THE SUPERIOR COURT OF
                                      :           PENNSYLVANIA
                                        :

              v.                         :
                                        :

DOMINIC JOHN FRATANGELI        :
                                        :

            Appellant        :     No. 148 EDA 2022

Appeal from the Judgment of Sentence Entered July 7, 2021
In the Court of Common Pleas of Chester County Criminal Division at
No(s):  CP-15-CR-0003622-2018

BEFORE:   BENDER, P.J.E., STABILE, J., and PELLEGRINI, J.[*]

MEMORANDUM BY BENDER, P.J.E.:        **FILED NOVEMBER 1, 2022**

Appellant, Dominic John Fratangeli, appeals from the judgment of sentence of an aggregate term of 4 to 10 years' incarceration, imposed after he was convicted of rape by forcible compulsion, 18 Pa.C.S. § 3121(a)(1); involuntary deviate sexual intercourse by forcible compulsion, 18 Pa.C.S. § 3123(a)(1); sexual assault, 18 Pa.C.S. § 3124.1; and two counts of aggravated indecent assault, 18 Pa.C.S. § 3125(a)(1) and (2).  After careful review, we affirm.

Appellant was convicted of the above-stated offenses following a three-day jury trial in March of 2021, based on evidence that he had oral and vaginal sex with an adult, female victim without her consent and by forcible compulsion.  On July 7, 2021, he was sentenced to the aggregate term set

_____

[*] Retired Senior Judge assigned to the Superior Court.

forth *supra*. He filed a timely post-sentence motion, which the court denied. Appellant then filed a timely notice of appeal, and he complied with the trial court's order to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. The court filed its Rule 1925(a) opinion on March 10, 2022.

Herein, Appellant states five issues for our review:

I. Whether the evidence was insufficient to support the convictions for rape, involuntary deviate sexual intercourse, and aggravated indecent assault (forcible compulsion) because the Commonwealth failed to prove the element of "forcible compulsion" beyond a reasonable doubt for each offense.

II. Whether the findings of guilt on the charges of rape, involuntary deviate sexual intercourse, and aggravated indecent assault (forcible compulsion) are against the weight of the evidence where the testimony of the complaining witness was vague and lacked specificity regarding "forcible compulsion."

III. Whether the trial court abused its discretion by precluding Appellant from publishing a portion of the Sexual Assault Nurse Examiner ("SANE") report, which related to injuries to the complaining witness, to the jury. Whether the trial court further abused its discretion by not allowing the SANE report to be provided to the jury during deliberations.

IV. Whether the trial court committed an error of law and/or abused its discretion when the court gave the jury an instruction on "hue and cry," which instructed the jury that a prompt complaint is circumstantial evidence of the sexual assault itself as well as "significant circumstantial support" of the victim's testimony that she was sexually assaulted.

V. Whether the trial court improperly considered Appellant's silence at sentencing regarding the criminal charges as failure to accept responsibility and show remorse.

Appellant's Brief at 5-6.

In assessing Appellant's issues, we have reviewed the certified record, the briefs of the parties, and the applicable law. Additionally, we have examined the 76-page, well-reasoned opinion of the Honorable Analisa Sondergaard of the Court of Common Pleas of Chester County. We conclude that Judge Sondergaard's comprehensive opinion accurately disposes of the issues presented by Appellant. **See** Trial Court Opinion, 3/10/22, at 2-53 (rejecting Appellant's argument that the Commonwealth's evidence was insufficient to prove the element of forcible compulsion); [1] **id.** at 53-56 (finding

_____

[1] We add to the court's analysis of this issue a discussion of Appellant's reliance on **Commonwealth v. Berkowitz**, 641 A.2d 1161 (Pa. 1994). There, Berkowitz "push[ed the complainant] onto [a] bed, … removed her undergarments from one leg[,]" and "then penetrated her vagina with his penis." **Id.** at 1163. Before the assault, Berkowitz locked the door of the room that he and the victim were in. **Id.** at 1164. However, the victim "never attempted to go to the door or unlock it." **Id.** Berkowitz also did not use his hands to physically "restrain[] her in any manner during the actual penetration…." **Id.** Our Supreme Court found these facts insufficient to prove that Berkowitz used forcible compulsion. **Id.** Appellant contends that the present facts mirror those in **Berkowitz** and, thus, we must reach the same conclusion as our Supreme Court did in that case.

We disagree. Here, unlike in **Berkowitz**, the evidence established that Appellant used physical force on the victim. For instance, the victim testified that, as she sat on the couch, Appellant "pulled [her] down so that … [her] behind was … at the edge of the sofa." N.T. Trial, 3/16/21, at 64. Appellant "started pulling at [her] pants" and she tried several times to pull them back up while telling him to stop. **Id.** at 65, 67. Nevertheless, Appellant "grabbed the ankles of [her] pants and pulled them off." **Id.** Appellant then performed oral sex on the victim as she "hit him on the shoulders, … trying to get him to retreat…." **Id.** at 68. Appellant then "grabbed [her] hands" and "pulled [her] into a standing position[,]" after which he "kind of pivoted [her] body and put [her] down on the floor of the living room." **Id.** at 69. As Appellant held her legs, he penetrated her vagina with his penis. **Id.** at 70. The victim testified
*(Footnote Continued Next Page)*

meritless Appellant's claim that the jury's verdict was contrary to the weight of the evidence); *id.* at 61-64 (rejecting Appellant's argument that the court abused its discretion by not publishing to the jury a portion of the SANE report or allowing that report to be provided to the jury during deliberations); *id.* at 64-69 (concluding that Appellant's challenge to the 'hue and cry' jury instruction is meritless);[2] and *id.* at 69-72 (rejecting Appellant's claim that

_____

that she had told Appellant no "[c]ountless" times and had just "given up." *Id.* at 71. During a subsequently-recorded phone call between the victim and Appellant, he seemingly conceded that he had "ripped [her] pants off," responding to her statement that he did so by apologizing and saying, "I thought you wanted it." Exhibit C-26, 3/17/21, at 5. When the victim asked Appellant what "made [him] think [she] wanted it" when she "was screaming no[,]" Appellant said that he "thought [she] was joking" and apologized. *Id.* We conclude that this evidence distinguishes the present case from *Berkowitz* and supports the trial court's conclusion that the evidence was sufficient to prove Appellant used forcible compulsion.

[2] In regard to Appellant's jury-instruction challenge, he contends that "[t]here is no legal precedent that permits a jury instruction on 'hue and cry'" and that the instruction "was particularly problematic in two aspects." Appellant's Brief at 41. Specifically, Appellant argues that the instruction "improperly allowed the jury to consider [the victim's] prompt complaint as circumstantial evidence that the underlying assault occurred[,]" and it "bolstered the credibility of [the victim] by stating that the prompt complaint constituted 'strong circumstantial evidence' for [her] testimony that she was assaulted." *Id.* at 42.

Notably, Appellant did not immediately object to the at-issue instruction when it was given. *See* N.T. Trial, 3/17/21, at 213-14. When he did object, after the instructions were finished and the jury was excused from the courtroom, he did not offer any specific grounds for challenging the instruction. *Id.* at 223. Instead, defense counsel simply stated, "Your Honor, just note my objection to the hue and cry instruction that was given regarding a prompt complaint." *Id.* Appellant points out that the court conducted a meeting with the parties "regarding the jury instructions prior to closing arguments." Appellant's Brief at 15 (citing N.T. Trial, 3/17/21, at 110). However, that
*(Footnote Continued Next Page)*

- 4 -

the court improperly considered his silence at sentencing as a failure to accept responsibility or show remorse). Accordingly, we adopt Judge Sondergaard's opinion as our own and affirm Appellant's judgment of sentence for the reasons set forth therein.[3]

Judgment of sentence affirmed.

---

meeting "was not held on the record" and, thus, we cannot discern whether Appellant raised the specific challenges to the jury instruction that he presents on appeal. *Id.* Moreover, Appellant did not raise these claims in his Pa.R.A.P. 1925(b) statement. Therein, Appellant simply quoted the at-issue instruction, prefaced by a statement that "the trial court committed an error of law and/or abused its discretion when the court instructed the jury as follows[.]" *See* Pa.R.A.P. 1925(b) Statement, 1/3/22, at 2 ¶ 5.

Due to Appellant's failure to specifically object to the 'hue and cry' instruction on the record or raise his appellate claims in his Rule 1925(b) statement, the trial court did not address those arguments at the time of trial, or in its Rule 1925(a) opinion. As such, we conclude they are waived. *See* Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."). Pa.R.A.P. 1925(b)(4)(vii) ("Issues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived."). To the extent the court generally discusses the basis for its decision to provide a 'hue and cry' jury instruction, we discern no abuse of discretion in its rationale. Thus, we adopt it herein.

[3] The court addresses two other issues in its opinion that Appellant has not raised on appeal. *See id.* at 56-61 (finding meritless Appellant's allegation that the court abused its discretion by precluding him from cross-examining the victim regarding her medications and mental health diagnosis); *id.* at 72-76 (rejecting Appellant's claim that his sentence is illegal because his two counts of aggravated indecent assault should have merged with his convictions for rape, involuntary deviate sexual assault, and sexual assault). We do not adopt the court's analysis of these claims, as Appellant has abandoned them herein.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/1/2022

Received 5/27/2022 12:20:27 PM Superior Court Eastern District

Filed 5/27/2022 12:20:00 PM Superior Court Eastern District
148 EDA 2022

*TCO part 1*

# Appendix A

COMMONWEALTH OF PENNSYLVANIA  : IN THE COURT OF COMMON PLEAS

: CHESTER COUNTY, PENNSYLVANIA

vs

: CRIMINAL ACTION

DOMINIC FRATANGELI  : NO. 3622-18

: SUPERIOR CT NO: 148 EDA 2022

Kathleen C. Wright, Esquire, attorney for the Commonwealth.
Kristine C. Mehok, Esquire, attorney for Defendant.

## OPINION

On December 10, 2021, Defendant filed a timely appeal following the denial of his post-sentence motion on November 15, 2021. An appeal having been taken, pursuant to Pa.R.A.P. 1925(a), the following statement is submitted.

Following a three day jury trial that took place from March 16, 2021 to March 18, 2021, Defendant was found guilty of the following: Rape, in violation of 18 Pa.C.S.A. § 3121(a)(1); Involuntary Deviate Sexual Intercourse, in violation of 18 Pa.C.S.A. § 3123(a)(1); Sexual Assault, in violation of 18 Pa.C.S.A. § 3124.1; and two counts of Aggravated Indecent Assault, in violation of 18 Pa.C.S.A. § 3125(a)(1) and (2). Defendant was found not guilty of two counts of Indecent Assault, in violation of 18 Pa.C.S.A. § 3126(a)(1) and (2).

On July 7, 2021, Defendant was sentenced as follows: (1) Count 1, Rape - four to ten years incarceration, costs, $1,000 fine, and $250 for DNA testing; (2) Count 2, Involuntary Deviate Sexual Intercourse - four to ten years incarceration to be served concurrent with count 1; (3) Count 4, Aggravated Indecent Assault, two to four years incarceration to be served concurrent with counts 1 and 2; and (4) Count 5, Aggravated

1

Indecent Assault, two to four years incarceration to be served concurrent with counts 1 and 2. In addition, Defendant was ordered to comply with the SORNA requirements. For sentencing purposes, Count 3, sexual assault, merged with both Rape and Involuntary Deviate Sexual Intercourse.

On July 16, 2021, Defendant filed a timely Post-Sentence Motion. On September 9, 2021, Defendant filed a Motion to Amend Defendant's Motion for Post-Sentence Relief. The post sentence motions were denied on November 15, 2021. On December 10, 2021, Defendant filed a Notice of Appeal. On December 13, 2021, an Order was entered requiring Defendant to submit a Concise Statement of Errors Complained of on Appeal within twenty-one (21) days. On January 3, 2022, Defendant filed said statement. On February 7, 2022, an Order was entered reassigning this case to the undersigned due to Judge Cody's retirement. Defendant raises seven issues on appeal.

**Sufficiency of the Evidence:**

Defendant's first issue on appeal alleges that the evidence was insufficient to support his convictions for rape, involuntary deviate sexual intercourse, and aggravated indecent assault because the Commonwealth failed to prove the element of forcible compulsion beyond a reasonable doubt.

The standard for reviewing the sufficiency of the evidence is "whether the evidence, viewed in the light most favorable to the Commonwealth as verdict winner, is sufficient to enable the fact-finder to find every element of the crime beyond a reasonable doubt." Commonwealth v. Matthew, 909 A.2d 1254, 1256-57 (Pa. 2006), citing Commonwealth v. Williams, 896 A.2d 523, 535 (Pa. 2006), cert. denied, 127 S.Ct.

2

1253 (2007), and Commonwealth v. Randolph, 873 A.2d 1277, 1281 (Pa. 2005), cert. denied, 547 U.S. 1058, 126 S.Ct. 1659 (2006).

In addition, all reasonable inferences drawn from the evidence must be viewed in the light most favorable to the Commonwealth. Commonwealth v. McCollum, 926 A.2d 527, 530 (Pa.Super. 2007), quoting Commonwealth v. Earnest, 563 A.2d 158, 159 (Pa.Super. 1989). "The test is whether the evidence, thus viewed, is sufficient to prove guilt beyond a reasonable doubt." McCollum, 926 A.2d at 530, citing Commonwealth v. Swerdlow, 636 A.2d 1173 (Pa.Super. 1994). "'This standard is equally applicable to cases where the evidence is circumstantial rather than direct so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt.'" McCollum, 926 A.2d at 530, quoting Swerdlow, 636 A.2d at 1176.

A conviction must be based on more than mere suspicion or conjecture, however, the Commonwealth does not need to establish guilt to a mathematical certainty. McCollum, 926 A.2d at 530, quoting Commonwealth v. Badman, 580 A.2d 1367, 1372 (Pa.Super. 1990). "Moreover, the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence." Commonwealth v. Marrero, 914 A.2d 870, 872 (Pa.Super. 2006), citing Commonwealth v. Bullick, 830 A.2d 998, 1000 (Pa.Super. 2003).

"Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances." Marrero, 914 A.2d at 872, citing Commonwealth v. DiStefano, 782 A.2d 574, 582 (Pa.Super. 2001), app. denied, 806 A.2d 858 (Pa. 2002). When evaluating the credibility of the witnesses and evidence as

3

well as the weight of the evidence, the fact-finder is free to believe all, part, or none of the evidence presented. Commonwealth v. Faulk, 928 A.2d 1061, 1069 (Pa.Super. 2007), app. denied, 944 A.2d 756 (Pa. 2008), quoting Commonwealth v. Stevenson, 894 A.2d 759, 773 (Pa.Super. 2006), app. denied, 917 A.2d 846 (Pa. 2007).

The uncorroborated testimony of one victim, if believed by the trier of fact, is sufficient to convict a defendant, if all the elements of a crime are established beyond a reasonable doubt. Commonwealth v. Mack, 850 A.2d 690, 693 (Pa.Super. 2004), citing Commonwealth v. Davis, 650 A.2d 452, 455 (Pa.Super. 1994), app. granted, 659 A.2d 557, affirmed, 674 A.2d 214 (Pa. 1996).

Findings of Fact:

The Commonwealth presented five witnesses and Defendant presented five witnesses at trial. In addition, the parties entered three factual stipulations.

M.C.
~~Michelle Cooper~~ testified that she is forty-eight years old and has worked in accounts payable at Ascension Press for twenty-five years. (N.T., 3/16/21, pgs. 45-46). She met her husband in June 2019 and they were married on September 19, 2020. (N.T., 3/16/21, p. 46). She resides at 321 William Taft Avenue, Downingtown, Chester County, Pennsylvania, and had resided there in August 2018. Id.

M.C.
~~Michelle Cooper~~ admitted to being nervous about testifying, but was "glad we're at this point, though." Id. She testified that she knows Defendant and identified him in open court. (N.T., 3/16/21, pgs. 46-47). On August 9, 2018, she called Mattioni Plumbing to cancel an appointment and Defendant answered the phone. (N.T., 3/16/21, pgs. 47, 82 and 95). Prior to August 8, 2018, she did not know Defendant. (N.T., 3/16/21, p. 95). They started talking and joking around. (N.T., 3/16/21, p. 47). Defendant emailed her,

4

saying he was sorry for emailing but wanted to ask permission to receive emails from Mattioni about appointments and she consented. (N.T., 3/16/21, pgs. 47-48 and 95-96). They communicated via email and then he texted her from his personal cell phone. (N.T., 3/16/21, pgs. 48 and 95).

They texted on and off throughout the day for about a week before they met in person. Id. They texted from August 11, 2018 through August 16, 2018. (N.T., 3/16/21, pgs. 50-51). M.C. ▆▆▆▆▆ testified that they discussed random things in the beginning of texting. (N.T., 3/16/21, p. 48). Defendant told her he was in the Army and had PTSD. (N.T., 3/16/21, p. 49). Since M.C.'S ▆▆▆▆▆ father returned from a year tour in Vietnam with PTSD, it meant a lot to her. Id. She decided if Defendant needed someone to talk to, she would talk to him. Id. Defendant also told her that he was a divorced single dad with four kids. Id.

On the second day of their texting, M.C. ▆▆▆▆▆ testified that the texts "turned sexual and aggressive, like flirtatious, aggressive." (N.T., 3/16/21, pgs. 48-50 and 96). Defendant told her that he had a good deal of threesomes. (N.T., 3/16/21, p. 51). She admitted to sometimes responding to his texts in a sexual manner. (N.T., 3/16/21, p. 96). Defendant asked her to do sexual things and she told him that she was not interested because she was interested in someone else. (N.T., 3/16/21, p. 52). During the duration of the texting, she never agreed to do anything sexual with him and specifically told him that she was not interested in having sex with him. Id.

On cross-examination, M.C. ▆▆▆▆▆ agreed that the following text exchange between them on August 11, 2018 starting at 10:45 p.m. was accurate:

Defendant: Can I come by
▆▆▆▆▆: No
MC

5

M.C. _____: Don't call
Defendant: Sorry, why can't I call
M.C. Ms. Cooper: I'm texting with the 48 year old right now. I can't do both at once. I thought you were going to call last night. Must have had a hell of a mess to clean up, huh?
Defendant: Lol sorry
Defendant: When I fun I cum
Defendant: When I cum I cum
M.C. Ms. Cooper: I guess so
Defendant: You would love it
Ms. Cooper: Sounds great
Defendant: Send me a pic
M.C. Ms. Cooper: No

(N.T., 3/16/21, pgs. 96-97 and Exhibit C-1). M.C. _____ also agreed that the following text exchange between them on August 13, 2018 starting at 9:32 a.m. was accurate:

Defendant: You mad at me
M.C. Ms. Cooper: Yes I'm at work. Are you? I'm not mad no.
Defendant: No I am not at work

(N.T., 3/16/21, pgs. 97-98 and Exhibit C-1). M.C. Ms. Cooper also agreed that the following text exchange between them on August 13, 2018 starting at 10:04 p.m. was accurate:

Defendant: I Want to come up and see you
Defendant: Hey
M.C. _____: I am old. No you can't see me. Hey right back at you
Defendant: So we can't hang
M.C. Ms. Cooper: I don't think so. Why do you want to hang with me? 48 year old, remember?
Defendant: I've told you time after time I like older women it's a number I like you
M.C. Ms. Cooper: But I don't want to jeopardize anything with the 48 year old (I'm 45). Timing sucks. A week too late. I like you but I want to see what happens with this guy. I like him a lot. You're too good to wait in the wings. Find a nice women, older if that's what you like. You're fantastic.
Defendant: Ok, so then you want me to leave you alone
M.C. _____: I just want you to know at this point, we won't be fucking. I like you a lot. But I need a realistic image. You're 10 years younger. I met him and liked him first. I don't do 2 men. You don't have to go away. It's just nothing is going to happen. I like talking to you.
Defendant: Well we can still hang without fucking
M.C. Ms. Cooper: Apple in the garden of eden......

6

(N.T., 3/16/21, pgs. 98-100 and Exhibit C-1).

M.C.

~~[REDACTED]~~ also agreed that via text on August 14, 2018 at 6:09 p.m., Defendant asked her, "You mad?" and she responded, "No." (N.T., 3/16/21, p. 101 and Exhibit C-1).

M.C.

~~[REDACTED]~~ acknowledged that the following text exchange between them on August 14, 2018 starting at 6:35 p.m. was accurate:

Defendant: What you doing
M.C. ~~Ms. Cooper~~: Leaving an appointment. Just got a Brazilian. First one. Don't normally do them. Going home now
Defendant: Yummy I bet that pussy looking yummy
Defendant: What you wearing
M.C. ~~Ms. Cooper~~: T shirt, stretch pants. What are you wearing?
Defendant: There is something about a women in stretch pants , nothing laying here in bed
Defendant: You have undies on
M.C. ~~[REDACTED]~~: Yes I normally do, remember?
Defendant: Yes lol
M.C. ~~Ms. Cooper~~: I have to drive. You can call if you want.
Defendant: I love your voice
M.C. ~~Ms. Cooper~~: Thank you
Defendant: Welcome, are you happy that we will meet
M.C. ~~Ms. Cooper~~: Yes
Defendant: Good, do you like your feet rubbed
Defendant: ?
M.C. ~~Ms. Cooper~~: NO!!!!!!!!!!
M.C. ~~[REDACTED]~~: Hate it!!!!
Defendant: Lol good
Defendant: Your back and shoulders
M.C. ~~Ms. Cooper~~: Nope. Don't like massages
Defendant: Ooh ok, just like other things massages hehe
Defendant: Massaged
M.C. ~~Ms. Cooper~~: Right

(N.T., 3/16/21, pgs. 102-104 and Exhibit C-1).

A Brazilian is a wax of the bikini area. (N.T., 3/16/21, p. 104). She told Defendant she had it done five days after she met him, just like she would have told the cashier at Wawa. (N.T., 3/16/21, pgs. 104-105). M.C. ~~[REDACTED]~~ agreed that the following text

7

exchange between them on August 15, 2018 starting at 8:47 a.m. was accurate:

> Defendant: What you we seeraing
> Defendant: Wearing
> M.C. ~~Ms. Cooper~~: Shirt, leggings, kitten heels
> Defendant: Sexy babe
> Defendant: I love leggings
> Defendant: I can't wait to see you
> M.C. ~~Ms. Cooper~~: You look so young
> Defendant: Lol I am.not young
> Defendant: You don't' like
> M.C. ~~Ms. Cooper~~: You look great
> M.C. ~~Ms. Cooper~~ Just 10 tears younger then me
> Defendant: Ty, looking great for you today

(N.T., 3/16/21, pgs. 105-106 and Exhibit C-1). She also agreed that the following text

exchange between them on August 15, 2018 starting at 10:05 a.m. was accurate:

> M.C. ~~Ms. Cooper~~: I don't get it. I don't get why you're pursuing me.
> Defendant: I like you, your hot, I am in to you
> Defendant: Your so funny and sweet and smart
> M.C. ~~Ms. Cooper~~ Yea, that's it. All that I don't get. This stuff doesn't happen to me
> Defendant: Well now it's happening babe
> M.C. ~~Ms. Cooper~~: Are you sure you're not on a tv show to humiliate the middle aged woman?
> Defendant: No babe, I want the older women
> M.C. ~~Ms. Cooper~~ Why? We're crankier
> Defendant: Who cares , they don't play games and they no how to fuck
> M.C. ~~Ms. Cooper~~: Well put

(N.T., 3/16/21, pgs. 106-107 and Exhibit C-1). The following text exchange between them

on August 15, 2018 starting at 10:20 a.m. was accurate according to M.C. ~~Ms. Cooper~~:

> Defendant: How's the kitty looking form the wax yesterday
> M.C. ~~Ms. Cooper~~: Smooth
> Defendant: I bet it does, I bet it looks amazing , do you wear thongs
> M.C. ~~Ms. Cooper~~: No, kids around
> M.C. ~~Ms. Cooper~~ I walk around in my panties

(N.T., 3/16/21, p. 107 and Exhibit C-1). M.C. ~~Ms. Cooper~~ also agreed on cross-examination

8

that the following text exchange between them on August 15, 2018 starting at 10:30 a.m.

was accurate:

M.C. ■■■■■■: You know we're not fucking tonight, right? You said
we would talk. Right?
Defendant: Yes we will talk babe , or have a porn party lol
M.C. ■■■■■■: Ha!!!!
Defendant: What lol
M.C. Ms. Cooper: Like is Everyman at Victory in on it and there will be
an orgy?
Defendant: Haha lol or we can watch it at your place lll
Defendant: Lol
Defendant: You would like a orgy huh
M.C. ■■■■■■: Never had one. Don't know. You have one?
Threesome?
Defendant: I have had a threesome with two chicks before
M.C. ■■■■■■: Oooooooohhhhhhh!!!!!!!

(N.T., 3/16/21, pgs. 107-108 and Exhibit C-1). M.C. Ms. Cooper agreed that the following text

exchange between them on August 15, 2018 starting at 10:43 a.m. was accurate:

M.C. Ms. Cooper: You're not married, right?
Defendant: No wht
Defendant: Why
M.C. Ms. Cooper: Just wondering. Been there, done that
Defendant: So you fucked married men babe
Defendant: I mean I have been there to
M.C. Ms. Cooper: 1, yes

(N.T., 3/16/21, p. 109 and Exhibit C-1). M.C. ■■■■■■ agreed to the accuracy of the

following text exchange between them on August 15, 2018 starting at 11:53 a.m.:

Defendant: I bet those lips are looking yummy
Defendant: Do I get a hug
M.C. Ms. Cooper: Yes
M.C. Ms. Cooper: It would be weird not to p
Defendant: Awww you're the best
Defendant: What not to hug me
M.C. Ms. Cooper: Yeah.
M.C. Ms. Cooper: As much as I know about you now you're like an old
friend
M.C. Ms. Cooper: Younger friend......
Defendant: Aww your so sweet babe. I feel the same about you

9

M.C. [redacted]: Except I'm a DECADE older then you!!!!
Defendant: So , it's ok
M.C. [redacted] Ms. Cooper: Yeah, ok
Defendant: It's ok if you are
Defendant: What you thinking about
M.C. [redacted] Ms. Cooper: I don't know. My hair
M.C. [redacted] Ms. Cooper It's in my eyes
Defendant: Can I play with it
M.C. [redacted] Ms. Cooper Sure
Defendant: Sweet , tonight I will
Defendant: You love it pulled to
M.C. [redacted] Ms. Cooper: Yes
Defendant: I might have to pull it
M.C. [redacted] Ms. Cooper You can't

(N.T., 3/16/21, pgs. 110-111, 124-124 and Exhibit C-1). M.C. [redacted] Ms. Cooper also agreed on cross-

examination that the following text exchange between them on August 15, 2018 starting at

12:28 p.m. was accurate:

Defendant: What kinda music you like
M.C. [redacted] Ms. Cooper: Tom Petty, Fleetwood Mac, Rob Zombie…..blah blah blah. You?
Defendant: Nice ,I love rock
M.C. [redacted] Ms. Cooper: Me too
Defendant: Good
M.C. [redacted] Ms. Cooper: Do you like to fuck to music?
Defendant: Yes I do, do you babe
M.C. [redacted] Ms. Cooper: Ya
Defendant: Heavy rock ?
M.C. [redacted]: Metal
M.C. [redacted] White Zombie
Defendant: Hot
Defendant: My kinda girl
M.C. [redacted] Ms. Cooper: Going out with Nancy for lunch.  Will write if I can.
Defendant: You are loud to aren't you
M.C. [redacted] Ms. Cooper: Very
Defendant: Good, you like to be talked to dirty
Defendant: Getting that ass smacked and hair pulled , feeling that balls smaking your ass
M.C. [redacted] Ms. Cooper: Yes

(N.T., 3/16/21, pgs. 111-112 and Exhibit C-1). M.C. [redacted] agreed that the following text

exchange between them on August 15, 2018 starting at 1:43 p.m. was accurate:

10

Defendant: What do you like touched

M.C. ███████: Ass tits shoulders

Defendant: I love to touch them

Defendant: Two more hours

M.C. Ms. Cooper: We're going to a public place. You can't

Defendant: How about in the car

M.C. ███████: No

Defendant: Lol

Defendant: Sorry

M.C. Ms. Cooper: No worries. Not mad

Defendant: Hope not, have you been looking forward to Meeting me

M.C. Ms. Cooper: Yes I have

Defendant: Yes

Defendant: You like getting your tits fucked

M.C. Ms. Cooper: Who doesn't

(N.T., 3/16/21, pgs. 112-113, 125 and Exhibit C-1). During the time these texts were sent, there was not a plan to go anywhere but the public place of Victory. (N.T., 3/16/21, p. 126). Finally, M.C. ███████ agreed that the following text exchange between them on August 15, 2018 starting at 2:14 p.m. and ending at approximately 2:22 p.m. was accurate:

Defendant: Ty babe, no, what's wrong

M.C. ███████: Just thinking

Defendant: Of

M.C. Ms. Cooper: Unicorns

Defendant: Lol bull

Defendant: Tell me

M.C. Ms. Cooper: You're not going to care. I assure you

Defendant: Tell me

Defendant: Babe

M.C. ███████: The 48 year old was still in the picture as of yesterday. Didn't hear from him last night and sent me a weird message today. Thinking he bailed. No communication speaks the loudest. I just feel like an ass again. I don't know. I don't want to be all mopey meeting you. I am so confused between you and him. Sorry.

(N.T., 3/16/21, pgs. 112-114 and Exhibit C-1).

In addition to texting, they spoke on the phone more than five times but less than

11

twenty times. (N.T., 3/16/21, pgs. 114-115). Defendant was calling her "babe" and "sexy." Id. During the week they were texting, Defendant asked five or six times to meet in person. (N.T., 3/16/21, p. 52). Defendant wanted to meet at her house and asked to meet there more than once. (N.T., 3/16/21, pgs. 52-53). Six days after her first call with Defendant, M.C. [Ms. Cooper] agreed to meet him in person. (N.T., 3/16/21, pgs. 53 and 82). She suggested that they meet at Victory Brewing Company in Downingtown. (N.T., 3/16/21, pgs. 52-53 and 82-83). She thought Victory would be a good place to talk and get something to eat. (N.T., 3/16/21, p. 53). She doesn't drink but thought Defendant may want to get a beer. Id. They planned to meet at Victory on August 15, 2021.

At that point M.C. [Ms. Cooper] felt friendly toward Defendant but felt that Defendant was pushy. (N.T., 3/16/21, p. 54). Prior to August 15, 2018, she had not met Defendant in person. (N.T., 3/16/21, pgs. 54 and 82). M.C. [Ms. Cooper] testified that her only intention was to talk with Defendant that day. (N.T., 3/16/21, p. 54). Prior to meeting at Victory, Defendant texted her between 4:10 and 4:15 stating that he drove to the Lionville Target and suggested they meet in that parking lot. (N.T., 3/16/21, pgs. 54 and 83). Since she was at work in the Eagleview Corporate Center, she was only five minutes away from the Lionville Target and drove to meet Defendant at the Target. (N.T., 3/16/21, pgs. 54-55 and 83). That location is in Chester County. (N.T., 3/16/21, p. 54).

She parked her car bumper to bumper with his car. (N.T., 3/16/21, p. 83). They initially both got out of their cars and hugged, but since it was a hot day Defendant suggested they sit in her air-conditioned car. (N.T., 3/16/21, pgs. 55 and 83). They talked for about five minutes before Defendant started making advances toward her by kissing her on the lips and touching her breasts and vagina over her pants. (N.T., 3/16/21, pgs.

12

55 and 83-84). When Defendant kissed her, she was shocked. (N.T., 3/16/21, p. 56). M.C. █████████ did not kiss him back and pushed him away quickly because that was not what she wanted. (N.T., 3/16/21, pgs. 56 and 84). She told him no when she pushed him away. Id. M.C. ████████ testified that Defendant said something like, "you know you want it." Id. Defendant then said he was sorry and stopped touching her, so she didn't tell him to get out of the car. (N.T., 3/16/21, pgs. 55-56 and 84). They talked for about three minutes before he kissed and touched her again. Id.

The first time Defendant touched her, it was on the breasts and the second time it was on the vaginal area. (N.T., 3/16/21, pgs. 55-56 and 85). Then he kept bouncing back between her breasts and vaginal area. (N.T., 3/16/21, p. 56). The touching was over her clothes, not underneath them. (N.T., 3/16/21, p. 85). They talked some more and then Defendant got friskier by continuing to touch her body and her vagina. (N.T., 3/16/21, pgs. 85-86).

Defendant took her hand and put it on his penis, which was not erect. (N.T., 3/16/21, pgs. 56-57 and 86). M.C. ████████ pulled her hand away as soon as he let go of it. (N.T., 3/16/21, pgs. 56 and 86). He did that a couple of times and she kept pulling her hand away telling him that he knows that wasn't why she was there. (N.T., 3/16/21, p. 57). M.C. ████████ did not consent to any of Defendant's touching in the car. Id.

Defendant then asked if they could go to her house and talk and she said, no "because you're not behaving." Id. Defendant promised he would behave and said he just wanted to talk, so M.C. ████████ relented. (N.T., 3/16/21, pgs. 57 and 87). They had spent twenty to thirty minutes in the Target parking lot before Defendant got in his own car to follow her home because he didn't know her address. (N.T., 3/16/21, pgs. 57-58 and 86-

13

88). Her house is a ten-minute drive from Target and she noticed she lost him during the drive on Route 113. (N.T., 3/16/21, pgs. 58 and 88). She arrived at her house without Defendant. (N.T., 3/16/21, p. 58).

M.C. ▓▓▓▓ called Defendant and he didn't answer, so she texted him. (N.T., 3/16/21, pgs. 58 and 88-89). She thought he was being smart, planned to mess around with her and was playing a game. (N.T., 3/16/21, pgs. 58 and 89). She sent him a colorful, condescending, and rude text message at 5:09 on August 15, 2018. Id. The text read, "I'm really not sure what your deal was, but I hope your fucking goal was met." (N.T., 3/16/21, p. 90 and Exhibit C-1). She asked if he went through Texas to get there and told him that she was going to change her mind about letting him come over to talk. (N.T., 3/16/21, pgs. 58, 91 and 123-124). Defendant then called and said he was pulled over by the police and asked for her address. (N.T., 3/16/21, p. 58). She gave him the address and Defendant said he was on his way. (N.T., 3/16/21, pgs. 58 and 90-91).

Defendant rang the doorbell when he arrived, and she let him into the townhouse where there was no one else present. (N.T., 3/16/21, pgs. 59, 87 and 91-92). Defendant followed her into the living room. (N.T., 3/16/21, pgs. 59 and 92). Photographs of ▓▓. M.C. ▓▓▓▓ living room were admitted and published to the jury. (N.T., 3/16/21, pgs. 59-61). She felt comfortable with him at the time, she hugged him and he hugged her back. (N.T., 3/16/21, pgs. 59, 61, 87 and 92). Then he lifted her shirt, put his hand under her shirt, and touched her breast over her bra. (N.T., 3/16/21, pgs. 59, 61-62, 92 and 124). She was wearing a loose-fitting tunic shirt and leggings. (N.T., 3/16/21, p. 62). ▓▓. M.C. ▓▓▓▓ testified that she either backed away or pushed him away and told him that's not why he was there. (N.T., 3/16/21, p. 61). That sexual touching was not consensual.

14

(N.T., 3/16/21, p. 124). The only consensual touching that occurred at her home was when she hugged Defendant upon his arrival. Id.

She then made a joke and told him that she would sit on one side of the L sofa and he could sit on the other side. (N.T., 3/16/21, p. 61). They sat on completely opposite ends of the sofa. Id. At that point in the evening, she felt like she had complete control over the situation. Id. She told him no, told him to stop doing that, and she expected him to listen. Id.

Defendant got up from where he sat on the couch and she stood up, too. (N.T., 3/16/21, pgs. 62-63). The were standing in front of the crook or angle part of the sofa. (N.T., 3/16/21, p. 63). M.C. ▮▮▮▮▮▮ testified that "somehow" she got sitting on that angle part. Id. She stated, "And I don't know - - you know, I was there. I was at the sofa. So it wasn't hard for me - - but I did not sit down, you know, voluntarily. So I'm not saying he threw me, but he may have insisted that I sit down." (N.T., 3/16/21, pgs. 63-64).

At that point, Defendant had no clothes on from the waist down. (N.T., 3/16/21, p. 64). Defendant asked her if she wanted to perform oral sex on him. Id. She could see his erect penis. (N.T., 3/16/21, pgs. 64-65). She declined and said, "no." (N.T., 3/16/21, pgs. 64 and 94). He did not force her to engage in oral sex on his penis. (N.T., 3/16/21, p. 94). He leaned over her and pulled her so that her behind was at the edge of the sofa. (N.T., 3/16/21, p. 64). She was laying on the sofa, but her feet were on the ground. Id.

Defendant started pulling at the waist of her stretchy leggings pants. (N.T., 3/16/21, pgs. 65-66). He would get them down a few inches and she would pull them back up by the waist. (N.T., 3/16/21, pgs. 65-66). M.C. ▮▮▮▮▮▮ testified that she remembers thinking "I'm 45 years old and I never had to fight for my pants before." (N.T., 3/16/21, p. 65). It

15

was comical in an ironic way. (N.T., 3/16/21, pgs. 92-93). She was laughing in a "dry, ironic, sarcastic kind of way." (N.T., 3/16/21, p. 93). This pulling the pants down and up went on for what seemed like forever, but it was probably just a minute or two. (N.T., 3/16/21, p. 65). Defendant then grabbed the ankles of her pants and pulled them off. (N.T., 3/16/21, p. 66). She told Defendant to stop when he was pulling her pants off. (N.T., 3/16/21, p. 67). She was laying on the couch and her rear end was either at the edge of the couch or off it. (N.T., 3/16/21, p. 65).

Defendant put his fingers inside her vagina. (N.T., 3/16/21, p. 67). ~~M.C.~~ testified that it wasn't just the tip of his finger that was in her vagina, but she doesn't know how far his fingers went in. Id. She told him no when he put his fingers in her vagina. Id. Defendant then performed oral sex on her by putting his mouth and tongue on her vagina and shook his head back and forth. (N.T., 3/16/21, pgs. 67-68 and 93-94). Defendant was positioned in front of her on his knees on the floor. (N.T., 3/16/21, p. 68). She did not scream or yell for help. (N.T., 3/16/21, p. 94). When asked if she did anything at that point to try to get him off her, ~~M.C.~~ responded, "I hit him on the shoulders. I kept smacking him on the shoulders, like trying to get him to retreat, but it - - it didn't last long. It wasn't like a 20 minute thing, but, again, it seemed like an eternity." (N.T., 3/16/21, p. 68). When asked if she was able to get away from Defendant at that point, she responded that she did not get away. Id. She was free when he stopped doing it. Id.

Next, Defendant grabbed her hands and pulled her into a standing position, pivoted her body and put her down on the living room floor. (N.T., 3/16/21, pgs. 68-69). This move was not quick, it was kind of slow. (N.T., 3/16/21, p. 71). It was described as being like "this is what we're doing next." Id. Defendant put her feet on his shoulders, held her

16

legs and penetrated her vagina with his penis. (N.T., 3/16/21, pgs. 70 and 95). When asked if she said anything at that point, M.C. responded, "At that point I had given up. I didn't say anything. I just lay there with my arms out and my head to the side. I didn't say anything." (N.T., 3/16/21, p. 71). She did not look at him. (N.T., 3/16/21, p. 72). She looked to the side, hoping it would be over soon. Id. She was very upset, very confused and was in shock. Id. Prior to that she told him no countless times. (N.T., 3/16/21, p. 71).

Defendant was inside her thirty to forty-five seconds then he ejaculated. (N.T., 3/16/21, p. 72). Defendant told her that he pulled out and ejaculated on the lips of her vagina. (N.T., 3/16/21, pgs. 72-73). He got up and went to the kitchen to clean himself with a wet paper towel. (N.T., 3/16/21, pgs. 73 and 119). He offered to get her one, but she declined and went into the bathroom to take care of herself. Id. She was in the bathroom for less than ten minutes and when she came out, he was dressed and ready to go. (N.T., 3/16/21, pgs. 73 and 119-120). His shirt was on, pants on, shirt tucked in, pants zipped up and shoes were on. (N.T., 3/16/21, p. 110).

Defendant was jumpy, which was different than when he arrived at the house. (N.T., 3/16/21, p. 73). He left immediately after being dressed, between 5:45 and 6:00, about ten minutes after he penetrated her. (N.T., 3/16/21, pgs. 73 and 120). She curled up on the couch and cried because she didn't know what happened and was in shock. (N.T., 3/16/21, pgs. 73-74). Defendant texted her 15 to 30 minutes later. (N.T., 3/16/21, pgs. 73-74 and 120-121). He first texted, "Don't be maf," and then texted, "Mad." (N.T., 3/16/21, pgs. 126-127 and Exhibit C-1). He then texted, "I'm sorry. Can we be friends? It scared me when I go that fast." (N.T., 3/16/21, p. 74).

17

Specifically, their entire text exchange on August 15, 2018 between 6:26 p.m. and 6:30 p.m. went as follows:

Defendant: Don't be maf
Defendant: Mad
M.C. ~~Ms. Cooper~~: I'm fine
Defendant: that just scared me
M.C. ~~Ms. Cooper~~: What did?
Defendant: Moving that fast
M.C. ~~████████~~: Yeah me too
Defendant: I am soo sorry
Defendant: Can we just be friends
M.C. ~~████████~~: I don't understand
M.C. ~~Ms. Cooper~~: Was that your whole intention?
Defendant: Can we be friends and that's it
Defendant: No
Defendant: It scared me going that fast
M.C. ~~Ms. Cooper~~: Why do you want to be friends?
Defendant: Because your cool
M.C. ~~████████~~: An hour ago you wanted to fuck me, now you only want to be friends.
M.C. ~~Ms. Cooper~~: Seems fishy

(N.T., 3/16/21, pgs. 121-122 and Exhibit C-1). The last text Defendant sent her before arriving at her house was, "No be there in a few" and the first text he sent her after leaving her house was telling her not to be mad. (N.T., 3/16/21, pgs. 126-127).

The next thing M.C. ~~████████~~ did was to call and talk to her friend Brian. (N.T., 3/16/21, p. 74). Thereafter, between 7:00 and 7:30, she called her best friend Joan Koehler and told her what happened. Id. She has known Joan since middle school. Id. After she first spoke to Joan, she did not make any decisions about what to do. (N.T., 3/16/21, p. 75). She spoke to Joan a second time that night and then they went to Paoli Hospital about 11:00 p.m., about five or six hours after she met Defendant. (N.T., 3/16/21, pgs. 75 and 117-118). She had time to think about what happened and spoke to two other people about it. (N.T., 3/16/21, p. 118). M.C. ~~Ms. Cooper~~ did text Defendant at 10:50 p.m.

18

and stated, "You've really fucked me up. I'm having a really hard time. Just wanted you to know." (N.T., 3/16/21, pgs. 122-123 and Exhibit C-1). Defendant did not respond to her text, nor did he call her. (N.T., 3/16/21, p. 123).

She decided to go to the hospital because of the situation, not because she had any bruising, scrapes, cuts, marks or was in pain. (N.T., 3/16/21, p. 119). She arrived at the emergency room and spoke to a physician's assistant or a nurse and told her what happened and that she had been raped. (N.T., 3/16/21, pgs. 75-76, 118 and 123). She was given the option to undergo an examination and M.C. decided to do it. (N.T., 3/16/21, p. 76). The examination itself took approximately two hours and with other tests that were done, she didn't leave the hospital until 6:00 a.m. Id. She testified that she felt very uncomfortable when she was being examined. Id. As a result of the examination, she was prescribed and took medication for possible sexually transmitted diseases. (N.T., 3/16/21, p. 77).

At some point the police arrived at the hospital. (N.T., 3/16/21, pgs. 77 and 119). She wanted to speak with the police and told them what happened. (N.T., 3/16/21, pgs. 77-78). After she left the hospital, she arrived home about 7:00 a.m. and found the police waiting for her. (N.T., 3/16/21, p. 78). When she went into the house with the police she felt nervous and was so tired because she hadn't slept all night. Id. The officers took her to the police station and she met with a few detectives, including Detective Trautmann and an advocate for her. (N.T., 3/16/21, pgs. 115-116). They discussed intercepting a phone conversation with Defendant and the purpose behind doing it. (N.T., 3/16/21, p. 116).

On the morning of August 16, 2018, M.C. participated in a recorded telephone conversation with Defendant while the detectives sat with her. (N.T., 3/16/21,

19

pgs. 78-78 and 116). While she was speaking with Defendant, M.C. ~~did not know~~ did not know where he was, what he was doing, where he was going or what mental state he was in at the time. (N.T., 3/16/21, p. 117). About a week after she filed everything with the police, Detective Trautmann informed her that Defendant was not divorced. (N.T., 3/16/21, pgs. 79-80).

Thereafter, she met with attorneys Prisco, Morley and Wright to discuss the incident and testified at a preliminary hearing. (N.T., 3/16/21, p. 79). M.C. ~~Ms. Cooper~~ testified that she has flashbacks of this incident. Id. She never consented to Defendant touching her breasts or vaginal area in the car that day. (N.T., 3/16/21, p. 80). She never consented to Defendant grabbing her breasts in her home that day. Id. She never consented to Defendant putting his fingers in her vagina that day. Id. She did not consent to Defendant performing oral sex on her that day. Id. She did not consent to Defendant having vaginal sex with her that day. Id.

On cross-examination, M.C. ~~Ms. Cooper~~ acknowledged that during the encounter at her house, she didn't scream out for help, didn't try to kick him out of the house and didn't tell him to leave. (N.T., 3/16/21, p. 92). She acknowledged that Defendant did not hit or punch her. (N.T., 3/16/21, p. 94). Defense counsel asked, "And nothing about it was violent, correct?" Id. M.C. ~~Ms. Cooper~~ responded, "I wouldn't say that. I mean, it wasn't like he was slapping me or anything, but that - - I was violated. That was violent." Id.

Upon the conclusion of M.C. ~~Ms. Cooper~~ testimony, the parties stipulated and allowed the entire text message exchange that took place between Defendant and M.C. ~~____~~ from August 11, 2018 to August 16, 2018 to be read in its entirely with the jurors following along with transcripts. (N.T., 3/16/21, pgs. 127-162 and Exhibit C-1).

**Joan Koehler** testified that she is forty-nine years old and has been a clinical specialist for remote devices at Triangulate Health for two years. (N.T., 3/17/21, pgs. 6-7). She became friends with [M.C.] in middle school and they have been friends for over twenty years. (N.T., 3/17/21, pgs. 7 and 15). She described [M.C.] as a very close friend and a private person. (N.T., 3/17/21, p. 7). Ms. Koehler stated that [M.C.] has been her rock when multiple things have happened in her life. (N.T., 3/17/21, p. 15). She is always someone to talk to. Id. [M.C.] does talk about things that have happened in her life, but she is typically a private person. Id.

When asked to describe [M.C.'s] normal demeanor, she responded, "[M.C.] is very funny. She enjoys life. She is that kind of person. She is always there for you if you need her as a friend, or you can call her if you are having a bad day. She loves to talk to you. She just loves people in general." (N.T., 3/17/21, p. 7). Ms. Koehler was asked to describe [M.C.] manner of speaking, she responded, "She's very confident. Her demeanor is always - - she's always put together. She's just that funny, loving person. Even if she is having a bad day, she doesn't show through that she's having a bad day." (N.T., 3/17/21, pgs. 7-8).

On August 15, 2018, Ms. Koehler was at home with her husband and kids when [M.C.] called at approximately 9:30 p.m. (N.T., 3/17/21, pgs. 8 and 17). [M.C.] was not herself. (N.T., 3/17/21, p. 8). She was crying, her voice would crack, and she was very upset. Id. She asked Ms. Koehler if she was alone and when she told her that she was with her husband, [M.C.] asked her to remove herself from the room. Id. Ms. Koehler went outside, and [M.C.] told her that she met somebody in the Lionville Target parking lot. (N.T., 3/17/21, pgs. 8-9). [M.C.] told her that he forced himself on

21

her in the parking lot. M.C. reported she kept telling him no and that he had to get off her. (N.T., 3/17/21, p. 9).

Ms. Koehler testified that M.C. explained that Defendant convinced her to let him go back to the house. Id. Ms. Koehler asked her "why," and she responded that Defendant has PTSD and she is the kind of person that listens and talks to anybody. Id. M.C. agreed to allow him to go to her house after he "promised he wouldn't do anything." Id. M.C. stated that when he got to her house, Defendant forced himself on her. Id. As she was reporting this to Ms. Koehler, she was "pretty upset about it" at the time she called her. Id.

Ms. Koehler told her the best thing to do would be to go to the hospital. Id. Her main concern was for M.C. to be medically treated for any bruising, tearing or vaginal issues as well as possible sexually transmitted diseases. (N.T., 3/17/21, pgs. 9-10). She wanted it documented if any issues arose. (N.T., 3/17/21, p. 9). When asked what words M.C. used to describe what happened, Ms. Koehler responded as follows: "She did inform me that he was - - in the car at the Target, she informed me that he was putting his hands - - trying to get his hands down her pants. She informed me that he was pulling her boobs out of her shirt. When they got home, she said the same regarding pulling her shirt, trying to get her boobs out of her shirt. Apparently at one point he turned around and tried to get her to suck his dick. And it was a continuous thing. And she kept trying to push him off, but she kind of felt defeated. She kept saying, no, no, and he wouldn't stop." (N.T., 3/17/21, p. 10).

Ms. Koehler testified that during the 9:30 phone call she told M.C. that it would be best to go to the hospital to get it documented for her safety. Id. As Ms. Koehler

22

was going to bed at 11:00 p.m., M.C. called and asked her to take her to the emergency room at Paoli Hospital and she agreed. (N.T., 3/17/21, pgs. 10 and 17-18). She drove to her house, picked M.C. up and drove her to the hospital. (N.T., 3/17/21, pgs. 9, 11-12 and 18). Ms. Koehler did not go into M.C.'s house at that time. (N.T., 3/17/21, p. 15). When she saw her, M.C. was shaking, crying and not herself. (N.T., 3/17/21, p. 11). Ms. Koehler described her as usually fun-loving and never shows her fears, but that night her demeanor did not look proper. Id. Her voice was cracking and her body language was shriveled up and scared, not like M.C. Id.

Ms. Koehler described M.C. as usually put together with a unique sense of style, but that night she was disheveled, and her shirt was not properly on. Id. The shirt looked like it was pulled down and wasn't fitting her properly. Id. It looked like there was a struggle on top of the shirt. (N.T., 3/17/21, pgs. 11 and 16). On the drive to the hospital, M.C. was crying, very upset and questioning herself as to why she let Defendant convince her that he wasn't going to do anything to her at the house. (N.T., 3/17/21, p. 12).

When they arrived at the hospital and checked in, the staff took M.C.'s vital signs and triaged her. Id. Ms. Koehler stayed with M.C. the entire time at the hospital except when the police were speaking with M.C. (N.T., 3/17/21, pgs. 12-13 and 16). She was present when the rape kit was completed on M.C. as they were looking for hair, fibers and sperm as well as physically checking her. (N.T., 3/17/21, p. 12). M.C. continued to shake and continued to have a cracked voice throughout the exam, so Ms. Koehler and the nurse were trying to keep it lighthearted by speaking of high school and their kids. (N.T., 3/17/21, pgs. 12-13 and 16-17). Ms. Koehler was trying

23

to get her mind off things to help her calm down because she was so upset and still seemed scared. (N.T., 3/17/21, pgs. 13 and 16-17). They left the hospital and Ms. Koeler drove M.C. to her home. (N.T., 3/17/21, pgs. 13-14 and 18). When they arrived back at M.C.'s house, Ms. Koehler noticed that the couch was pushed away. (N.T., 3/17/21, pgs. 13-14).

Prior to M.C.'s calling her that night, she had not mentioned Defendant to Ms. Koehler. (N.T., 3/17/21, p. 17). Ms. Koehler was not with Defendant and M.C. earlier that day and only knows what M.C. reported to her. Id. Ms. Koehler was asked if M.C. expressed to her the reason she didn't want to go to the hospital the first time they spoke that night and she responded as follows: "She did express to me that she was scared. She was afraid just for, because she is a private person, something - - that something would get out there that she was raped, as she said. She also was worried because she has children, regarding her children. She didn't want her children to know anything that was going on." (N.T., 3/17/21, p. 18).

**Lindsay Shannon** testified that she has been employed as a registered nurse in the emergency room at Paoli Hospital. (N.T., 3/17/21, p. 20). As an emergency room nurse, she fills all the roles in the ER including triage, trauma, being a staff nurse and intermittently filling the role of charge nurse. Id. The charge nurse oversees the entire emergency department, without direct patient assignment. Id. Because the Paoli emergency room is a trauma center they see anything from urgent care, bumps, bruises, broken bones, chest pain, falls, stabbings, and gun shot wounds. (N.T., 3/17/21, pgs. 20-21). They also deliver babies, deal with drug overdoses, and do psych consults. (N.T., 3/17/21, p. 21).

24

Ms. Shannon started her education at West Chester University in forensic chemistry but switched to nursing so she could have more patient interaction. Id. She graduated with a BSN from Immaculata. Id. She is certified in advanced cardiac life support, basic life support, and pediatric advanced life support. Id. She is board certified in emergency nursing. Id. She is also trauma trained and is trained as a sexual assault nurse examiner (SANE). Id. The SANE training consists of advocacy and evidence collection. Id. She did an additional two day training course that focused on specific outreaches and advocacy for patients that suffer sexual assault. Id. The SANE training was also covered in undergraduate studies. (N.T., 3/17/21, p. 21). Evidence collection was a topic and it was also covered under trauma for evidence collection for gunshots and stabbings. Id. SANE training was also a topic under the certified emergency nurse test she took. Id.

In addition to her routine responsibilities treating patients, she performs quality chart audits for their department. Id. Ms. Shannon makes sure that the standards of care are being met in the emergency department for vital signs and pain. Id. She is also a preceptor for new graduate nurses to help them get acclimated to the emergency department and trains experienced nurses who are new to the trauma role. Id. She is a member of Sigma Theta Tau, which is an honor society for nurses and belongs to the International Association of Forensic Nurses. Id.

During her career as a nurse at Paoli Hospital, she has examined approximately forty patients who have reported sexual assaults. (N.T., 3/17/21, p. 23). On average, she examines approximately five per year. Id. A sexual assault nurse examination is completed for patients with a chief complaint of being sexually assaulted. Id. It includes

25

medical screening, evidence collection, offering blood work and urine samples and prophylactic treatment for sexually transmitted diseases, and emergency contraception for unwanted pregnancy. Id. A SANE exam takes between two and four hours. Id. Every exam is done the same way every time, in a standard procedure. (N.T., 3/17/21, pgs. 23-24). The patient has the right to refuse any part of it that they don't want to complete it. Id. The instructions are read word for word for each exam. (N.T., 3/17/21, p. 24).

The SANE exam starts with obtaining consent to begin the exam. Id. Then evidence collection takes place and photographs must be taken. Id. The paper charting and SANE documentation is completed before medical treatment is offered with blood work, urine samples and medications. Id. Usually the patient is discharged and her role ends when she gives the evidence to the police department. Id.

Late in the evening on August 15, 2018 and into the early morning hours on August 16, 2018, she was working at Paoli Hospital as an emergency room nurse. (N.T., 3/17/21, pgs. 24-25 and 45). She was on the 7:00 p.m. to 7:00 a.m. shift. (N.T., 3/17/21, p. 45). During that time, she performed a SANE exam with a kit on M.C. ▓▓▓▓▓▓. (N.T., 3/17/21, p. 25). She had been admitted to the hospital at 12:17 a.m. and the exam started at 3:45 a.m. (N.T., 3/17/21, pgs. 25 and 46). When M.C. ▓▓▓▓▓▓ first arrived, she completed intake and the triage nurse completed the pertinent past medical history. (N.T., 3/17/21, p. 25).

Ms. Shannon explained that the SANE exams are only completed in rooms with solid doors to ensure privacy, so they waited for a room to be available. Id. In the meantime, since a SANE exam is a one-on-one nurse to patient ratio, Ms. Shannon would have had to find coverage for whatever role she had been in and give up her other patient

26

assignments. Id. Then she would introduce herself to the patient and find out the exact location where the incident occurred. (N.T., 3/17/21, p. 26). They have to contact law enforcement from that jurisdiction to let them know a SANE exam is about to take place. She then contacts the crime victim center. Id. During the overnight hours it is an on call process and she has to wait for a return call. Id. She provides the patient's name and identifiers and they wait for them to respond to the hospital. Id. They are the advocate to provide support to the patient before anything is started. Id. This is the standard procedure whenever a patient is there for a SANE exam and these protocols were followed with M.C. [redacted]. Id.

Ms. Shannon sees every patient's name, date of birth and chief complaint on the electronic charting system, so she would have seen the SANE request for M.C. [redacted]. Id. In addition, the triage nurse would have also sought her out about the need for the exam. Id. During the exam, the advocate is allowed to be present if the patient is agreeable. (N.T., 3/17/21, p. 27). Also in the room is Physician Assistant Mari Jo Goodsite. (N.T., 3/17/21, pgs. 27 and 45-46).

Once the examination starts and the kit is opened, Ms. Shannon's role is to read the instructions word for word, verbatim. That way the patient is aware of every step of what will happen and is also to give Ms. Goodsite the instruction of what to do. (N.T., 3/17/21, pgs. 27 and 35). After Ms. Shannon reads the instruction, she hands the swab or tool to Ms. Goodsite. (N.T., 3/17/21, p. 27). Ms. Goodsite completes the swab and hands it back to Ms. Shannon. Id. Ms. Shannon makes sure it is packaged, sealed and labeled correctly. (N.T., 3/17/21, pgs. 27 and 35). This is the standard procedure utilized in every SANE exam. (N.T., 3/17/21, p. 27).

27

Ms. Shannon identified in open court the SANE kit she performed on ~~Ms. Cooper~~ M.C. (N.T., 3/17/21, p. 28 and Exhibit C-7). The only difference in the kit from the last time she saw it in August 2018 is that it has been opened and resealed. (N.T., 3/17/21, pgs. 28-29). The original seal of evidence tape was applied by Ms. Shannon. (N.T., 3/17/21, p. 28). Ms. Shannon identified Exhibit C-8 as an unused SANE kit. (N.T., 3/17/21, p. 29). It is the same or substantially the same type of SANE kit that was used on ~~Ms. Cooper~~ M.C. in August 2018. Id.

Ms. Shannon identified Exhibit C-9 as a disposable speculum that is used during the SANE exam to better view the vaginal vault and cervix to allow for internal collection of evidence. (N.T., 3/17/21, pgs. 30 and 49). Ms. Shannon testified that the disposable speculum has a battery powered flashlight that "allows us to see any fluids, tearing or blood, anything that would be in the vaginal vault where we could see and we could direct our swabs." Id. It is the same or substantially the same type of device that was used on Ms. Cooper in August 2018. (N.T., 3/17/21, pgs. 30-31). The speculum is similar to one used in a normal gynecological exam, but theirs is disposable. (N.T., 3/17/21, p. 49).

Ms. Shannon identified Exhibit C-10 as the SANE documentation, which is the packet of paper they use every time they do a SANE exam with direct questions to be asked to the victim and the answers get recorded on the paperwork. (N.T., 3/17/21, p. 31). Exhibit C-10 is the documentation utilized with ~~Ms. Cooper~~ M.C. and has Ms. Shannon's handwriting on it. (N.T., 3/17/21, pgs. 31-32). This document is completed after the kit is done and the patient can start to "relax a little bit." (N.T., 3/17/21, p. 32). It is done by the nurse at the bedside, where the question is asked exactly as it is written on the form and the nurse records the answer as it is given. (N.T., 3/17/21, pgs. 32-33). That is what she

28

did with M.C. _____ on the night of August 16, 2018. (N.T., 3/17/21, pgs. 33-34).

The SANE document is used in the regular course of conducting business within the emergency room at Paoli Hospital and is also kept in the regular course of business. (N.T., 3/17/21, p. 33). This document that contains the patient's answers is used for medical diagnosis, medical treatment and evidence collection. Id. Ms. Shannon was responsible for filling out the SANE documentation. (N.T., 3/17/21, p. 46).

When she was in the examination room with M.C. _____ and Ms. Goodsite, the first thing they did was get M.C.'S _____ consent to proceed. (N.T., 3/17/21, pgs. 34-35). If a patient was wearing the original clothing, a sheet is placed on the ground and the victim is instructed to remove every piece of clothing. (N.T., 3/17/21, p. 35). However, the next step that was taken with M.C. _____ was the oral assault collection via two cotton tipped swabs. Id. There is an envelope with the words "oral assault collection sample" on which they must record the victim's name, date, time and who collected the sample. (N.T., 3/17/21, p. 36). If a sample is not collected, they have to state the reason. Id. Ms. Goodsite swabbed inside M.C.'S _____ mouth with the two swabs, and she handed them to Ms. Shannon. (N.T., 3/17/21, pgs. 36-37). Ms. Shannon rubbed the swabs on the sterile slides provided, placed them in the marked container and placed it back in the envelope. Id.

Ms. Shannon testified as follows regarding the external genitalia swabbing of M.C. _____: "So female anatomy is - - your whole genitalia is - - like your vulva, you swab the outsides. Then you have your labia folds, and the - - outside is swabbed, but you also have to part them to swab the interior a little bit." (N.T., 3/17/21, p. 38). The swabs are then placed back in the envelope and properly labeled. (N.T., 3/17/21, pgs. 38-39). The

29

internal vaginal swab is done next of the vagina which is the interior of the labia. (N.T., 3/17/21, pgs. 39 and 43). The speculum is used to visualize the vaginal vault, the internal vagina. (N.T., 3/17/21, p. 39). Swabs are taken of the sides and of the cervix. Id. The swabs are placed in the correct envelope and properly labeled. Id. The next step completed on M.C. ~~Ms. Cooper~~ was the rectal swab, with two swabs taken from around the anus and then placed back into the corresponding envelope. (N.T., 3/17/21, pgs. 39-40).

After the kit is completed, and everything is sealed and labeled on the envelopes, they are put back in the box and the box is sealed. (N.T., 3/17/21, p. 40). The next thing they did with M.C. ~~Ms. Cooper~~ was take photographs of any markings they found and then took two photographs of her face. Id. Then Ms. Shannon sat with M.C. ~~Ms. Cooper~~ and completed the SANE documentation. (N.T., 3/17/21, pgs. 40-41). They completed the consent section, personal history, and questions about the assault and assailant. (N.T., 3/17/21, p. 41). M.C. ~~Ms. Cooper~~ was asked to give a narrative about what happened, and Ms. Shannon recorded in quotes what she told her. Id.

There are then specific questions that were asked about what happened after the assault regarding showering, changing clothes, defecation, and urination. (N.T., 3/17/21, pgs. 41-42 and 51-52). She was then asked specific questions about the assault about what did and did not happen regarding kissing, hitting, sucking, biting, strangulation, penetration (what was and wasn't used and where), and ejaculation. (N.T., 3/17/21, pgs. 41-42). Ms. Shannon recorded all of M.C.'s ~~Ms. Cooper~~ answers as thoroughly, completely, and accurately as possible on the documentation. (N.T., 3/17/21, pgs. 42 and 46-47).

On cross-examination, Ms. Shannon was questioned about Exhibit C-10, the SANE documentation. (N.T., 3/17/21, p. 47). She identified her signature at the top and her

30

initials at the bottom of the document. Id. Ms. Shannon answered the observation questions about M.C. on the form, such as noting that she was alert, oriented and conscious. (N.T., 3/17/21, pgs. 47-48). Ms. Shannon asked M.C. if she was able to recall the events and Ms. Shannon checked "yes" after "unable to recall events." (N.T., 3/17/21, p. 48). However, M.C. was able to give her a narrative of what happened that evening and Ms. Shannon recorded it on the SANE document as it was being told to her word for word. (N.T., 3/17/21, pgs. 54-55 and 59-60). Therefore, Ms. Shannon testified that M.C. was able to recall the events. (N.T., 3/17/21, p. 60). Ms. Shannon could not recall why the form was checked that M.C. was unable to recall events. (N.T., 3/17/21, p. 60). She acknowledged that it could have been an error on her part. Id.

The assessment of injuries to the body and genitalia parts of the SANE documentation are completed during the examination when they observed all the parts of M.C.'s body. (N.T., 3/17/21, p. 50). There were no marks, scratches, bruising or tenderness on M.C.'s body, including her vagina and vaginal area. (N.T., 3/17/21, pgs. 50-51).

M.C. was asked questions regarding the assailant. (N.T., 3/17/21, pgs. 41-52). Ms. Shannon recorded her answers that the assailant was a person who was known to her as an acquaintance, and he did not have any injuries. (N.T., 3/17/21, pgs. 52-53). M.C. was asked if any type of coercion were used during the assault and she responded "no" to weapon, hitting (punching, slapping), kicking, pushing, restraining (physically threatening), strangulation (choking) and other. (N.T., 3/17/21, pgs. 53-54 and Exhibit C-10).

31

Thereafter, medications and treatment protocols were reviewed with ~~Ms. Cooper~~ M.C. and she was informed that she had the right to refuse any she did not want. (N.T., 3/17/21, p. 42). She was offered treatments for gonorrhea, chlamydia, HIV, hepatitis and offered emergency contraception. (N.T., 3/17/21, pgs. 42-43). ~~Ms. Cooper~~ M.C. had a choice of whether or not to proceed with each of the steps of the SANE kit. (N.T., 3/17/21, p. 43). Once the SANE report was completed, blood work was taken, a urine sample was obtained, and ~~Ms. Cooper~~ M.C. was given any medications she opted to receive. Id. ~~Ms. Cooper's~~ M.C.'s examination was completed at 6:40 a.m. (N.T., 3/17/21, p. 44). After the SANE kit is completed, it remained in Ms. Shannon's possession until she handed it over to law enforcement herself. Id. Part of the SANE documentation is the transfer of evidence where the police officer signs his name. (N.T., 3/17/21, pgs. 44-45). Ms. Shannon handed the kit to Corporal Gravina. (N.T., 3/17/21, p. 45).

**Officer Kevin Coyle** testified that he has been employed by the Downingtown Police Department in Chester County, Pennsylvania for twenty years. (N.T., 3/17/21, p. 62). He has crime scene investigation training for the collection of latent prints, latent evidence, hidden evidence, blood, bodily fluids, and fingerprints. Id. He was working the morning of August 16, 2018 and received an assignment to assist Detective Troutmann at ~~Ms. Cooper's~~ M.C.'s house located at 321 William Taft, Downingtown. (N.T., 3/17/21, pgs. 62 and 77). He reported to the location between 8:00 and 8:30 a.m. (N.T., 3/17/21, p. 62).

Prior to his arrival on scene, Officer Coyle received a phone call from patrol and learned what presumably occurred. (N.T., 3/17/21, p. 63). Upon his arrival, Detective Trautmann gave him a full report on the incident. Id. Officer Coyle fully processed the scene, on the first floor of the home, by photographing and forensically examining it. (N.T.,

32

3/17/21, pgs. 63 and 77). He started with photographing the exterior of the unit and then worked his way through the first floor. Id. The house had two front doors, a screen or glass door and the main door. (N.T., 3/17/21, p. 77). He photographed the hall, from the front door in, and the kitchen and family room. (N.T., 3/17/21, p. 63). Officer Coyle did not notice any damaged items. (N.T., 3/17/21, p. 78).

He next looked for other areas of evidentiary interest based on the conversation he had with Detective Trautmann. (N.T., 3/17/21, p. 64). Officer Coyle inspected the family room couches and carpeting as well as the kitchen trash can. Id. He and Detective Trautmann utilized alternative light sources on the surfaces. Id. Officer Coyle testified that "[b]asically it's a bunch of fancy flashlights that have different wavelengths to them. They are measured in namometers, but basically they are different colors." Id. They are used to look for latent or hidden evidence. Id.

In this case they used UV light to look for bodily fluids, that they found in four areas. (N.T., 3/17/21, pgs. 64-65). When the light illuminated the areas they photographed them, marked them, labeled them and then collected them. (N.T., 3/17/21, p. 65). The areas of interest that had fibers were individually collected with sterilized tweezers and placed individually into envelopes labeled "fiber one, two three." (N.T., 3/17/21, pgs. 65-66). The trace fibers were located five to six feet from the corner of the couch. (N.T., 3/17/21, p. 78). The fibers were not found located up against the couch. Id. The fibers were found within several inches of each other. Id.

Officer Coyle identified Exhibit C-11 as the photograph he took of the area five or six feet off the corner of the L shaped couch in the family room. (N.T., 3/17/21, pgs. 65-66). The photograph shows the area of interest and the measuring device they used.

33

(N.T., 3/17/21, pgs. 66-67). Then he took many more pictures zeroing in on the area. (N.T., 3/17/21, p. 67). The measuring device is a scale, so the forensic laboratories can blow up the images to exact scale. Id.

Officer Coyle identified Exhibit C-12 as the photograph he took of the trace evidence they found. (N.T., 3/17/21, pgs. 67-68). He identified Exhibit C-13 as the photograph he took of the carpeting utilizing a UV light, which shows two fluoresced spots which were areas of further interest. (N.T., 3/17/21, p. 68). Exhibit C-17 is an overall picture that shows the relevance of the four items of further interest in relation to the couch. (N.T., 3/17/21, p. 69). Exhibit C-14 is a closer picture of Exhibit C-17. Id.

The UV light used is a light purple and the illuminated spots are a "little bit darker, closer to a blue shade." (N.T., 3/17/21, p. 70). Officer Coyle explained that the light fluorescence "illuminates or highlights certain bodily fluids, proteins, different wavelengths, things from blood up to fingertips." Id. The area portrayed in the pictures is about five or six feet from the couch. Id. The located areas of interest were identified by what they were, such as fibers or fluids. (N.T., 3/17/21, pgs. 70-71). The fluids were suspected to be bodily fluids. (N.T., 3/17/21, p. 78).

After the areas of interest were photographed the evidence was collected. (N.T., 3/17/21, p. 71). The fibers were collected individually with sterilized tweezers and the trace fluid was collected as a DNA sample. Id. The officer then moved to the kitchen to photograph the trashcan and paper towels that were reportedly used after a sexual act. (N.T., 3/17/21, p. 72). Officer Coyle described Exhibits C-15 and C-16 as photographs of the trashcan and paper towels. (N.T., 3/17/21, pgs. 72-74). The entire trash bag, including the paper towels, was collected and inventoried to be brought to the processing lab at the

34

police station. (N.T., 3/17/21, pgs. 73-74).

The collected items were transported back to the station and Officer Coyle entered them into the evidence vault. (N.T., 3/17/21, p. 71). In the police controlled laboratory, the officer processed the trash bag by separating the evidence of value from the common trash. (N.T., 3/17/21, p. 74). The common trash was discarded. Id. The paper towels were dried and saved for future evidence processing through a lab. Id. Officer Coyle identified Exhibit C-18 as the evidence envelope that he sealed using his handwriting for the date, initials, and badge number on the evidence tape. (N.T., 3/17/21, pgs. 74-75). The processing laboratory references were also on the envelope. (N.T., 3/17/21, pgs. 75-76). The paper towels retrieved from the scene were inside the envelope. (N.T., 3/17/21, p. 75).

After the conclusion of Officer Coyle's testimony, three stipulations were read to the jury regarding the accuracy of the call and text logs between M.C. ▓▓▓▓▓ and Defendant, and the proper collection, processing, storage and forensic testing of the SANE evidence and DNA evidence. (N.T., 3/17/21, pgs. 79-87 and Exhibits C-19, C-20, C-21, C-22, and C-23).

**Detective Keith Cowdright** testified that he has been a detective with the Chester County Detectives Office for four and a half years. (N.T., 3/17/21, p. 89). Prior to that, he was a patrol officer with the Coatesville Police Department from 2001 to 2005 and a special operations patrol officer and detective sergeant with the New Garden Police Department from 2005 to 2017. (N.T., 3/17/21, pgs. 89-90). Detective Cowdright explained that the Chester County Detectives are the investigative arm of the District Attorney's Office. (N.T., 3/17/21, p. 90). They are tasked with assisting all the local police

35

*TCO part 2*

departments with major investigations that are labor intensive. Id. They handle most homicide investigations. Id. They are also a conduit between local departments and federal agencies. Id.

Over the course of his twenty-year career, Detective Cowdright has been to numerous trainings, including those by the FBI, ATF and DEA on crimes scenes. (N.T., 3/17/21, pgs. 90-91). He has experience investigating sexual assaults and conducting wire taps and intercepts. (N.T., 3/17/21, p. 91). He is certified by the Pennsylvania State Police to conduct one party intercepts. Id. He explained that in Pennsylvania it is against the law to record somebody without their consent, but there are some exceptions for law enforcement capacities. Id. There is a week-long training, they have to be authorized by the District Attorney's Office and they have to be authorized to be certified by the governor of the state. (N.T., 3/17/21, pgs. 91 and 100-101). The training was about the law that is applicable to the intercepts, the equipment that is used and how it is done; it is not about fostering conversation. (N.T., 3/17/21, p. 101). Since his certification, he has done thirty to forty intercept recordings. (N.T., 3/17/21, pgs. 91-92).

Detective Cowdright testified that his office was contacted about a sexual assault case. (N.T., 3/17/21, p. 92). The Downingtown Police Department requested assistance in conducting a one party intercept and cell phone extractions. (N.T., 3/17/21, p. 92). Their computer forensic unit conducted extractions from the victim's cell phone using hardware and software. Id. Her phone was plugged in and a digital copy was made of everything on the phone including the operating system, text messages, pictures, emails, and voice mails. Id. The information collected includes when the calls were placed, how long they lasted, and GPS information if it is imbedded in pictures. Id. The Chester

36

County Detectives routinely performs these extractions. (N.T., 3/17/21, p. 93). Detective Cowdright identified Exhibit C-24 as the call log and text messages extracted from M.C.'s phone. Id.

On August 15, 2018 at 5:33 p.m., M.C. received a text that stated, "No, be there in a few." (N.T., 3/17/21, p. 94). On the same date at 5:38:55 p.m. she received a phone call from 215-431-4094 that lasted five minutes and 42 seconds and ended at 5:44 or 5:45. (N.T., 3/17/21, pgs. 95-96). On the same date at 6:26 p.m., she received a text from cell phone number 215-431-4094 that stated, "don't be maf" then "mad." (N.T., 3/17/21, p. 95).

On August 16, 2018 at approximately 11:30 a.m. at the Chester County Detectives Office, he conducted a consensual intercept as part of this investigation. (N.T., 3/17/21, pgs. 96-97 and 101). Prior to placing the call, Detective Cowdright introduced himself to M.C., then he went to fill out paperwork for the wire while M.C. met with the District Attorneys about whether she is cooperating voluntarily and without force. (N.T., 3/17/21, pgs. 101-102). They reviewed the most recent communication between Defendant and M.C. to decide the right way to engage the target. (N.T., 3/17/21, p. 102). The term "target" refers to the person being called and is listed on the paperwork as such. (N.T., 3/17/21, p. 104). The intercept was started with a text message. (N.T., 3/17/21, p. 102).

They recorded a phone call between M.C., the consenting party, and Defendant, the target. (N.T., 3/17/21, pgs. 97 and 100). A digital recorder with a microphone was placed in M.C.'s ear. (N.T., 3/17/21, p. 97). When she placed the phone against her ear and made the call, the digital recorder records everything that was

37

said. Id. Present during the intercept was Detective Cowdright, M.C. ▓▓▓▓▓, Detective Trautmann and a crime victim's advocate. (N.T., 3/17/21, pgs. 97 and 102). They were able to hear most of the conversation between M.C. ▓▓▓▓▓ and Defendant as it was happening. (N.T., 3/17/21, p. 97). Defendant made statements relevant to the investigation during the conversation. Id. Since the call was to Defendant's cell phone, Detective Cowdright did not know where he was or what he was doing when he received the call. (N.T., 3/17/21, p. 103).

The recording of the intercept was transferred to a CD, entered into evidence in a special location called the wire repository, and a copy was provided to the District Attorney who approved the wire. (N.T., 3/17/21, p. 98). Detective Cowdright identified Exhibit C-25 as the CD containing the wire intercept. Id. The recording of the intercept was played in open court with the jurors following along with a transcript. (N.T., 3/17/21, pgs. 99-100).

**Defendant Dominic Fratangeli** testified that he is thirty-eight years old and understands that he does not have to testify. (N.T., 3/17/21, p. 112). Defendant lives in South Philadelphia, has four children, and was married at the time of trial. (N.T., 3/17/21, pgs. 113-114). When asked, "[i]n 2018 were you married?", Defendant responded, "[y]es, I was." (N.T., 3/17/21, p. 114). When asked how far he went in school, Defendant responded, "[c]ollege." Id. He spent approximately fourteen years in the military before being medically retired and honorably discharged. Id. He served two tours in Baghdad, Iraq. Id.

Defendant testified that he did not sexually assault M.C. ▓▓▓▓▓. (N.T., 3/17/21, p. 112). He acknowledged having a sexual encounter with her, and testified that she did not tell him no, did not push him, did not punch him, and did not tell him to stop. Id. When

38

asked "[w]as any part of it was nonconsensual?", Defendant responded, "[n]o, it was not." Id.

Defendant first met M.C. when he was working for Mattioni Plumbing, Heating & Cooling and she called on August 9, 2018 to reschedule an appointment. (N.T., 3/17/21, pgs. 115 and 124). He was married in August 2018. (N.T., 3/17/21, p. 115). He started communicating with M.C. via email, then progressed to text messages and phone conversations over the next few days. (N.T., 3/17/21, pgs. 115 and 124). They eventually agreed to meet in the Lionville parking lot. (N.T., 3/17/21, p. 116). He arrived first and when she arrived, they both got out of the cars. Id. They hugged and kissed each other and then M.C. asked him to get in her vehicle. Id.

Defendant testified that they were talking about life, her day, what's going on, and they were "joking around, flirting, you know, sexual talk too." Id. He eventually kissed her, and she kissed him back. Id. There was sexual touching over the clothes while they were in the car. (N.T., 3/17/21, pgs. 116-17). M.C. did not tell him to stop, did not tell him it was nonconsensual, and did not tell him no. (N.T., 3/17/21, p. 117). He did not force her to touch him. Id.

M.C. told him that her father was a Vietnam veteran and said that they should go to her father's house and lay on his couch, which was weird to Defendant. Id. M.C. than stated they could go to her house and Defendant agreed. Id. M.C. did not tell him that he needed to be a good boy or behave as a condition of coming to her house. (N.T., 3/17/21, p. 118). She told him to follow her there, which he did. Id.

After Defendant parked, he went to the door, rang the doorbell, and sent ███

39

M.C.
___ a text letting her know that he was there. Id. She invited him in, she hugged him, and they kissed. Id. Defendant testified that M.C. ___ then unbuckled his pants and grabbed his penis. (N.T., 3/17/21, pgs. 118-119). They eventually made it to the couch where they sat talking and flirting. (N.T., 3/17/21, p. 119). They started kissing again. Id. M.C. ___ was talking about her Brazilian wax and they agreed that she would take her pants off, with his assistance, to show him the Brazilian wax. Id. He did not rip her pants off, nor did he struggle with her to get her pants off. Id.

Defendant testified that M.C. ___ did not punch, hit, or kick him. Id. She did not tell him to stop as her pants were coming off. Id. She did not tell him no. (N.T., 3/17/21, pgs. 119-120). Once M.C.'s ___ pants were off, she wanted him to perform oral sex, which he did. (N.T., 3/17/21, p. 120). Thereafter, they went to the ground. Id. Defendant described it as follows: "I was on my knees. I held her hand. As I held her hand, she held my hand, and we - - we gently went to the ground out by - - by where the TV is." Id. Defendant asked her to give him oral sex. He testified, "[s]he said no and I just left it as that. I respected that." Id.

At the time of the sex he weighed 175 to 180 pounds. Id. He did not drag her to the floor. Id. He couldn't. Id. He did not fight to get her on the floor. Id. She did not tell him that she did not want to have sex on the floor. (N.T., 3/17/21, pgs. 120-121). She did not say no during the oral sex and did not say no during the sex on the floor. (N.T., 3/17/21, p. 121). Thereafter, M.C. ___ told him that if he needed to clean himself off she told him where the bathroom was and told him there were towels in the kitchen. Id. M.C. ___ went to the bathroom, so he went to the kitchen. Id. He cleaned up, put his pants on, buckled his pants, put his shirt on, and tucked in his shirt. Id.

40

He did not suspect anything was wrong at that time. Id. She was acting normal. Id. M-C. [redacted] came out of the bathroom no more than three minutes later and he was waiting in the kitchen. (N.T., 3/17/21, pgs. 121-122). Defendant testified as follows: "She was actually smiling. She was joking with me. She - - she stated, quote-unquote, do you usually do this? Do you meet women offline? And I said, no, I don't, and then she continued to state that you must have - - ... So she stated that you must have 19 kids, like giggling and laughing about it. I said, no, no, I only have my four children. So she - - she was - - to me, you know, she wasn't acting out of the ordinary, you know, or upset, or anything like that, to that nature." Id.

They talked for ten to twenty minutes. Id. She hugged and kissed him. Id. He hugged and kissed her. Id. Since it was getting late, he told her he had to get home to do some things and she was fine with that. (N.T., 3/17/21, p. 123). He left between thirty to forty-five minutes after they had sex. Id. He talked to her later that day via text message and phone conversation. Id. He told her that he just wanted to be friends. (N.T., 3/17/21, pgs. 123-124). He wanted to get to know her more on a friend level before anything escalated into a relationship. (N.T., 3/17/21, p. 124).

On cross examination, Defendant acknowledged he does not know M.C.'s [redacted] middle name and does not know the name of her children, but he believes her favorite color is black. (N.T., 3/17/21, pgs. 124-125). He agreed that he read her text messages and replied to them. (N.T., 3/17/21, p. 125). He was aware of everything she said in her text messages. Id. On August 11, 2018, he texted M.C. [redacted] and asked if he could come by her house and she said no. (N.T., 3/17/21, p. 126 and Exhibit C-1). Also on that date, after he texted her, "When I cum I cum" he then asked her to send him a picture and

41

she told him no. Id.

Defendant acknowledged that on August 13, 2018 he texted M.C. and asked if she wanted to "play army?" and she responded, "Me? No." (N.T., 3/17/21, p. 127 and Exhibit C-1). He then asked her, "Can we play something then"? and she answered, "Probably not. I don't like games." Id. Thereafter, he texted for the second time that he wanted to come up and see her. (N.T., 3/17/21, pgs. 127-128 and Exhibit C-1). She responds, "No you can't see me. Hey right back at you." (N.T., 3/17/21, p. 128 and Exhibit C-1).

Defendant acknowledged that he read the text message M.C. sent him on August 13, 2018 that stated, "I just want you to know at this point we won't be fucking. I like you a lot. But I need a realistic image. You're 10 years younger. I met him and I liked him first. I don't do 2 men. You don't have to go away. It's just nothing is going to happen. I like talking to you." (N.T., 3/17/21, pgs. 128-129 and Exhibit C-1). He responded, "Well we can still hang without fucking." (N.T., 3/17/21, p. 129 and Exhibit C-1). When he responded, "No no lol we will be fine," he was referring to the fact that they would be fine if they hung out together. (N.T., 3/17/21, pgs. 129-130 and Exhibit C-1). She responded, "I don't believe that honestly." (N.T., 3/17/21, p. 130 and Exhibit C-1).

On August 14, 2018, Defendant texted and asked M.C. if she liked her feet rubbed and she responded, "NO!!!!!!!!!!" "Hate it!!!!" (N.T., 3/17/21, p. 130 and Exhibit C-1). He then asked about massaging her back and shoulders and she responded, "Nope. Don't like massages." (N.T., 3/17/21, pgs. 130-131 and Exhibit C-1). On August 15, 2018, he texted her again trying to get them to go to her place. (N.T., 3/17/21, pgs. 131-132 and Exhibit C-1). Defendant acknowledged that a few texts later, he again suggested going to

42

her place. (N.T., 3/17/21, p. 132 and Exhibit C-1). Thereafter, he suggested that she should not wear undies in the pants she was wearing, and she responded, "I think I'll keep my undies on. They have a skull on the back." (N.T., 3/17/21, pgs. 132-133 and Exhibit C-1). He responded, "Sexy, I like to see." (N.T., 3/17/21, p. 133 and Exhibit C-1). She responded, "Probably not." Id. When she texted, "You know we're not fucking tonight, right? You said we would talk. Right?" he responded, "Yes we will talk babe , (sic) or have a porn party lol." Id. Defendant told her in the texts that he was divorced, but that was not true at the time. (N.T., 3/17/21, p. 134 and Exhibit C-1).

Defendant testified that he promised her the plan was to talk, but then when they met up, things changed. (N.T., 3/17/21, p. 133 and Exhibit C-1). Turning back to questions about the texts, Defendant stated that he may have to pull M.C.'S hair and she said, "You can't....Better just peek from afar. So no pulling takes place." (N.T., 3/17/21, pgs. 134-135 and Exhibit C-1). Defendant acknowledged that M.C. was telling him there was going to be no hair pulling. (N.T., 3/17/21, p. 135).

When Defendant later texted her and asked if she was horny, she responded, "Nope!!!!" (N.T., 3/17/21, p. 135 and Exhibit C-1). In another text, Defendant asked if she needed a kiss and M.C. stated, "No I'll be ok thanks." (N.T., 3/17/21, p. 136 and Exhibit C-1). When he asked if she liked her legs rubbed, she responded, "Nope." Id. He asked her what she likes touched, she said "ass, tits, shoulders." Id. Defendant said, "I love to touch them" and "two more hours." Id. M.C. responded, "We're going to a public place. You can't." Id. Defendant responded, "How about in the car" and she said, "No." (N.T., 3/17/21, p. 137 and Exhibit C-1).

Defendant again texted her asking to meet at her place to talk, and she said,

"Probably not a good idea." Id. Defendant admitted that it did not surprise him that in the text messages he had suggested five times to go to M.C.'s ~~place~~ place. (N.T., 3/17/21, pgs. 137-138 and Exhibit C-1). When Defendant then texted, "I promise babe . (sic) I will talk" she responded, "No. I can't. Restaurant." (N.T., 3/17/21, pgs. 137-138 and Exhibit C-1).

While texting, the plan was for them to meet at a public place, Victory, but then plans changed when she agreed to meet him at Target. (N.T., 3/17/21, pgs. 136-137). Defendant testified that when he was following her to her place, she called and texted acting erratically because he didn't show up. (N.T., 3/17/21, pgs. 139-141). He said she was acting out of the ordinary and was being very verbal towards him and said she was going to change her mind. (N.T., 3/17/21, pgs. 140-141).

The last text between the parties before he arrived at her house was when he texted, "no be there in a few" at 5:33:56 p.m. (N.T., 3/17/21, p. 140 and Exhibit C-1). Then they had a phone conversation at 5:39 p.m. that lasted for five minutes and 42 seconds. (N.T., 3/17/21, p. 140 and Exhibit C-24). Defendant agreed that they got off the phone at approximately 5:45 p.m. (N.T., 3/17/21, pgs. 141-142). Defendant arrived at her door between 6:00 and 6:05 p.m. Id.

The first text message that was sent by Defendant after he left her house was sent at 6:26:34 p.m. (N.T., 3/17/21, p. 142). After they had sex, M.C. ~~was~~ was fine and was not acting out the ordinary. (N.T., 3/17/21, p. 143). When he left the house they were on good terms. Id. He sent the "don't be mad" text after he left the house because he thought it would be better if they just stayed friends and was going to tell her. (N.T., 3/17/21, pgs. 143-144). Defendant acknowledged that the first six texts he sent her after

44

leaving her house were "Don't be maf ," "Mad," "That just scared me," "Moving that fast," "I am.soo (sic) sorry," and "Can we just be friends." (N.T., 3/17/21, p. 144 and Exhibit C-1). He testified that "I didn't directly just say sorry. I just said, hey listen - - you know, at that point - - at that point, you know, what I was dealing with and what was going on at my mind at that time, you know, I - - I stated, you know, don't be mad. I just want to be friends. You know, I don't - - I don't move that fast. And that's - - that's what I stated to her via text." (N.T., 3/17/21, p. 144).

Defendant admitted that he walked in her door between 6:00 and 6:05, and then texted her at 6:26 after he left. (N.T., 3/17/21, p. 145). When reminded about his direct testimony that he left her house thirty to forty-five minutes after sex, he responded that he had given a "rough estimate." Id. Defendant was asked the following, "I'm not a mathematician. But based on the math of when you said you got to her house and when you were texting her when you were already gone, you weren't even there 30 to 45 minutes, right?" Id. He responded, "At her house? I believe so. I'm not sure off hand. Again, you know, I wasn't looking at - - at my phone or my watch, so ..." Id.

On cross-examination, Defendant testified that M.C. only said no to performing oral sex on him. (N.T., 3/17/21, pgs. 145-146). He stated that she did not say no in the car, when he stuck his fingers in her vagina, when he performed oral sex on her, or when he had her on the floor with her legs over his head. (N.T., 3/17/21, p. 146). She did not say no at all. Id.

Defendant remembers the phone call the following morning at approximately 11:00. Id. Defendant acknowledged that when M.C. started talking to him about what happened, he said, "it was so bad." (N.T., 3/17/21, p. 148 and Exhibit C-26). The following

45

exchange took place on cross-examination regarding the intercepted phone call:

Q    She says, I mean, I told you no and you – and she finishes hers – continued on, and you say, I know, right?

A    Yeah. She said no to the oral sex.

Q    You're suggesting that she is only talking about the oral sex right here; is that correct?

A    Yes, that's what I – I took that by and just given my – my state of mind at that situation, you know, being up all night given what's going on with my father at that point.

Q    Okay.

A    You know, I was – I was dealing with a lot mentally.

Q    You didn't say that anywhere in this transcript, I only thought you were talking about the oral sex, right?

A    No, no, but I'm just saying given – given what you – you just asked, so I – I said she – she stated – she said no, and I stated, I know you said no. She said no to me. The only no that was said to me at all was when she said no to oral sex. And I respected that and I – I let it go. I didn't force anything.

Q    If you could flip to page five.

A    Yes, ma'am.

Q    So you're claiming that she – that your only understanding about the no is to oral sex, right?

A    Yes.

Q    That's your – your contention right now?

A    Yes.

Q    So when she says to you, you shouldn't have done that, you believed she was talking about what?

A    When I told her I just wanted to be friends and, you know – you know, to me, she felt like I led her on and I did her wrong. So I was – I was being remorseful given that situation. You know, I was – I was more worried about her at that situation because of me, you know, telling her I just wanted to be friends with her and she – she was hurt about it. And I had – like I said, she – she was going through stuff and I was going through stuff.

Q    Okay. And then she – she asked you after that, how many times have you done that before? You said, never, right?

A    Yes, meaning having – having, you know, a random hookup and stating that I just want to be friends with you after that.

Q    You're really expecting – your claim is that your entire apology in this is about a random hookup –

A    Well –

Q    – and that she said no to oral sex? That's what you're talking about here?

A    Yes, I am.

46

Q        And all the while you're sobbing on the phone with her, right?

A        Yeah, because my dad is dying.

Q        But you weren't sobbing when you first called her, right? When you were talking about your dad, you weren't crying? You didn't start crying until she started confronting you about what you did, correct?

A        Correct, because you caught me off guard because I'm being accused of something that I didn't do.

Q        Well, how can I catch you off guard when you already texted her that you were sorry?

A        Yeah, I was sorry because I just wanted to be friends. I'm sorry that I hurt your feelings. I'm sorry that, you know, that I – just at that point in my life when that happened I just realized, hey, listen, you know, I do want to work things out with my ex. It opened up my eyes, and I was apologetic about that, yes.

Q        Okay. So on page five –

A        Yes, ma'am.

Q        -- and we're now down to line 24 when she says, Dominic, you freaking ripped my pants off. You don't say to her, no, I didn't, I just helped you, right?

A        Yeah. At that point I was – like I said, my – my mental state and you know ...

Q        Yes or no.

A        I'm sorry. I thought you wanted it like that. That's what I answered, but I'm – I'm telling you what I'm interpreting from that and what – what – what's going on in my mind at that time, ma'am. That is my answer.

Q        Okay. And then further down at line 28 she says, what made you think I wanted it? I was screaming no.

Now, are you expecting everyone to believe that you were talking about the oral sex at that point too?

A        Well, she was being very joking when I was there. Never once did she ever scream at the top of her lungs or scream at me and state, get off of me, or anything like that to that nature. So, I mean – and I'll tell you this. ▅▅▅▅▅▅, she jokes a lot. She's – she's – she's very jokish. And, you know, she was just – at times she's like all over the place, so ...

Q        If you could flip to page six, please.

A        Yes, ma'am.

Q        At line 27 – line 26 and line 27 – you're talking about after you got pulled over – you say, like I didn't want to come back over. I'm like listen because I just wanted to talk to you and I didn't want any of that.

Okay. Well, you did go over, right?

47

A       Well, eventually because, yeah, she was acting erratical. She was cursing at me. So I – I was kind of worried more geared towards her mental health. So I was – I was – so with that, I turned around and said, hey, listen, I will come over, because again I was worried about her mental health at that time because the way she was acting erratical towards me.

Q       So looking at your timeline, you said you were talking for ten to 20 minutes and you left 30 to 45 minutes after sex; is that correct?

A       I would – that's – that's an approximate. Offhand, like I said, I wasn't looking at my – my clock per se. I just knew at that point like –

Q       Well, you were there because you said it was getting late and I had to go, right? You had to get home to your family?

A       Yeah, because it was starting to get dark out. I said that I had to leave. I had to get up early the next day.

Q       You'll agree with me that by your account, you were there for at most 15 to 20 minutes; is that correct?

A       No, no. I – give or take it was – it was definitely longer than 15 to 20 minutes. I mean, to me, that's – that's – that's – it felt like, to me, it was a lot longer than 15 to 20 minutes that I was there.

(N.T., 3/17/21, pgs. 148-153 and Exhibit C-26).

On redirect examination, Defendant testified that after he had left M.C.'s ██████████ house and texted "That just scared me," she responded, "What did?" (N.T., 3/17/21, p. 154 and Exhibit C-1). Prior to them meeting in person, Defendant texted M.C. ██████████, "Well we can still hang with out fucking," and she responded, "Apple in the garden of eden......" (N.T., 3/17/21, p. 155 and Exhibit C-1).

**Raymond S. Vantassell** testified that he is fifty-seven years old, lives in Wanna, West Virginia. (N.T., 3/17/21, pgs. 156-157). For over thirty years he has been an over-the-road truck driver and hauls motorcycles. (N.T., 3/17/21, p. 157). He knows Defendant from the military because they both served at the training site at Fort Indiantown Gap in Harrisburg, Pennsylvania. (N.T., 3/17/21, pgs. 157-158). Mr. Vantassell has known Defendant for six or seven years in the military community and knows his reputation in that

48

community. (N.T., 3/17/21, p. 158).

When asked if Defendant has a reputation for nonviolence, he responded, "No he does not. Yes, he has a reputation for nonviolence." (N.T., 3/17/21, p. 159). When asked if Defendant has a reputation for being truthful, Mr. Vantassell responded, "Yes, he does." Id. When asked what Defendant's reputation is for being truthful, he responded, "He's a very truthful individual." Id. When asked what Defendant's reputation is for abiding by the law, he responded, "I've never known him to break any laws." (N.T., 3/17/21, pgs. 159-160).

On cross-examination, he admitted that he was not at Ms. Cooper's home on the evening of August 15, 2018. (N.T., 3/17/21, p. 160). Mr. Vantassell was asked about discussions he had with people in the community about Defendant's reputation, or overheard people in the community discussing Defendant and he responded, "Well not necessarily, no. I'm just - - I'm just giving you my opinion." (N.T., 3/17/21, pgs. 160-161).

**David Wallace, III** testified that he is forty-three years old and has been a crisis counselor for two months at Berks Counseling Center located in Reading, Pennsylvania. (N.T., 3/17/21, p. 162). He has known Defendant since 2008 from serving in the United States Army. (N.T., 3/17/21, pgs. 162-163). Mr. Wallace reported that he knows Defendant's reputation in the community. (N.T., 3/17/21, p. 163). When asked what Defendant's reputation is for nonviolence, he responded that Defendant "is a nonviolent, law abiding citizen." Id. When asked what Defendant's reputation is for being truthful, he responded, "He's 100 percent truthful." (N.T., 3/17/21, pgs. 163-164).

On cross-examination he admitted that he was not at M.C.'S ▮▮▮▮▮▮ home on the evening of August 15, 2018. (N.T., 3/17/21, p. 164). When asked if he had conversations

49

with other people in the community about Defendant's reputation he responded "yes", and the conversation occurred about a year ago. (N.T., 3/17/21, pgs. 164-165).

Upon the conclusion of Mr. Wallace's testimony, the parties entered into a stipulation that if called to testify, Maria Fratangeli and Andrew Fratangeli would testify to Defendant's reputation in the community as peaceful, truthful and law abiding. (N.T., 3/17/21, pgs. 166-167). Andrew is Defendant's nephew and Maria is Defendant's sister. (N.T., 3/17/21, p. 167).

Discussion:

Defendant is challenging the sufficiency of the evidence of his conviction of rape, involuntary deviate sexual intercourse and aggravated indecent assault. He alleges that the Commonwealth failed to prove the element of forcible compulsion beyond a reasonable doubt for each offense. This Court disagrees.

The offense of rape is set forth in 18 Pa.C.S.A. § 3121(a)(1), which states that "[a] person commits a felony of the first degree when the person engages in sexual intercourse with a complainant ... [b]y forcible compulsion." The offense of involuntary deviate sexual intercourse is set forth in 18 Pa.C.S.A. § 3123(a)(1), which states that "[a] person commits a felony of the first degree when the person engages in deviate sexual intercourse with a complainant ... by forcible compulsion." The offense of aggravated indecent assault is set forth in 18 Pa.C.S.A. § 3125(a)(2), which states that "a person who engages in penetration, however slight, of the genitals or anus of a complainant with a part of the person's body for any purpose other than good faith medical, hygienic or law enforcement procedures commits aggravated indecent assault if ... the person does so by forcible compulsion."

50

Forcible compulsion is statutorily defined in relevant part as "Compulsion by use of physical, intellectual, moral, emotional or psychological force, either express or implied." 18 Pa.C.S.A. § 3101. Pennsylvania Courts have "observed 'forcible compulsion' as the exercise of sheer physical force or violence and has also come to mean an act of using superior force, physical, moral, psychological or intellectual to compel a person to do a thing against that person's volition and/or will." Commonwealth v. Gonzalez, 109 A.3d 711, 720 (Pa.Super. 2015), citing Commonwealth v. Ables, 590 A.2d 334, 337 (Pa.Super. 1991). "A determination of forcible compulsion rests on the totality of the circumstances, including but not limited to this list of factors: 'the respective ages of the victim and the accused, the respective mental and physical conditions of the victim and the accused, the atmosphere and physical setting in which the incident was alleged to have taken place, the extent to which the accused may have been in a position of authority, domination or custodial control over the victim, and whether the victim was under duress.'" Gonzalez, 109 A.3d at 721, quoting Commonwealth v. Rhodes, 510 A.2d 1217, 1226 (Pa. 1986).

"It is not mandatory to show that the victim resisted the assault in order to prove forcible compulsion." Id. It has been held that a victim's uncorroborated testimony is sufficient to support a rape conviction. Gonzalez, 109 A.3d at 721, citing Commonwealth v. Wall, 953 A.2d 581, 584 (Pa.Super. 2008). The Gonzalez Court pointed out that "[t]he distinction between forcible compulsion and lack of consent is important to remember. With regard to consent, the Crimes Code states: 'The consent of the victim to conduct charged to constitute an offense or to the result thereof is a defense if such consent negatives (sic) an element of the offense or precludes the

51

infliction of the harm or evil sought to be prevented by the law defining the offense.'" Gonzalez, 109 A.3d at 721, quoting 18 Pa.C.S.A. § 311(a). "'Forcible compulsion' means 'something more' than mere lack of consent." Gonzalez, 109 A.3d at 721, quoting Commonwealth v. Smolko, 666 A.2d 672, 676 (Pa.Super. 1995). "'Where there is a lack of consent, but no showing of either physical force, a threat of physical force, or psychological coercion, the 'forcible compulsion' requirement ... is not met.'" Id.

Applying these standards to the case at hand, it is clear that the evidence was sufficient to establish forcible compulsion beyond a reasonable doubt. The evidence as set forth above established that M.C. ~~[Ms. Cooper]~~ told Defendant numerous times throughout the week and on the day of the incident that she was not going to have sex with him. She repeatedly told him no throughout the sexual assault. They struggled over his attempts to pull down her pants, and she told him to stop. As he tried to pull them down, she pulled them back up until Defendant successfully ripped them from her body. Defendant pulled her body to the edge of the couch and subjected her to oral sex while she was telling him no, hitting him on the shoulders, smacking him on the shoulders and trying to get him to retreat. She was only able to get free when Defendant himself stopped. Defendant put her on the floor and held her legs with her feet on his shoulders as he penetrated her with his penis. M.C. ~~[Ms. Cooper]~~ testified that prior to this she had told him no countless times. When questioned on cross-examination about any violence in the encounter, M.C. ~~[Ms. Cooper]~~ responded that while Defendant was not slapping her, the violence occurred when Defendant violated her.

Defendant's responses in the texts after he left her house and during the consensual phone intercept corroborate the evidence of forcible compulsion. These

52

include him requesting M.C. to not be mad, making repeated apologies, begging for forgiveness "on everything he has," and crying after being confronted with the fact that she was screaming "No" during the sexual assault while he was trying to convince her that he has never done anything like that before.

Under the totality of the circumstances and viewing the evidence in the light most favorable to the Commonwealth, there was sufficient evidence of forcible compulsion beyond a reasonable doubt. Therefore, Defendant's issue on appeal is without merit.

**Weight of the Evidence:**

Defendant's second issue on appeal alleges that the convictions of rape, 18 Pa.C.S.A. § 3121(a)(1), involuntary deviate sexual intercourse, 18 Pa.C.S.A. § 3123(a)(1), sexual assault, 18 Pa.C.S.A. § 3124.1, and Aggravated Indecent Assault, 18 Pa.C.S.A. § 3125(a)(2), are against the weight of the evidence. Specifically, he alleges that the evidence of forcible compulsion was very weak, and the testimony of the complaining witness regarding lack of consent lacked credibility and was not supported by the evidence. We disagree.

"A motion for new trial on the grounds that the verdict is contrary to the weight of the evidence, concedes that there is sufficient evidence to sustain the verdict." Commonwealth v. Widmer, 744 A.2d 745, 751 (Pa. 2000), citing Commonwealth v. Whiteman, 485 A.2d 459 (Pa.Super. 1984). "Thus, the trial court is under no obligation to view the evidence in the light most favorable to the verdict winner." Widmer, 744 A.2d at 751, citing Tibbs v. Florida, 457 U.S. 31, 38, 102 S.Ct. 2211 (1982), n. 11, 102 S.Ct. 2211. An allegation that the verdict is against the weight of the evidence is

53

addressed by and at the discretion of the trial court. Widmer, 744 A.2d at 751-752, citing Commonwealth v. Brown, 648 A.2d 1177 (Pa. 1994).

A new trial should not be granted due to a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. Widmer, 744 A.2d at 752, citing Thompson v. City of Philadelphia, 493 A.2d 669, 673 (Pa. 1985). "A trial judge must do more than reassess the credibility of the witnesses and allege that he would not have assented to the verdict if he were a juror. Trial judges, in reviewing a claim that the verdict is against the weight of the evidence do not sit as the thirteenth juror. Rather, the role of the trial judge is to determine that 'notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.'" Id.

"'[A] new trial should be awarded when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail.'" Commonwealth v. Sullivan, 820 A.2d 795, 806 (Pa.Super. 2003), app. denied, 833 A.2d 143 (Pa. 2003), quoting Commonwealth v. Goodwine, 692 A.2d 233, 236 (Pa.Super. 1997), app. denied, 700 A.2d 438 (Pa. 1997). Stated another way, the evidence must be "so tenuous, vague and uncertain that the verdict shocks the conscience of the court.'" Sullivan, 820 A.2d at 806, quoting Commonwealth v. La, 640 A.2d 1336, 1351 (Pa.Super. 1994), app. denied, 655 A.2d 986 (Pa. 1994).

The Pennsylvania Supreme Court has noted that the decision to grant or deny a motion for a new trial based upon a claim that the verdict is against the weight of the evidence is within the sound discretion of the trial court. Commonwealth v. Cash, 137

54

verdict. The testimony from ~~Ms. Cooper~~ M.C. was compelling and was corroborated by Defendant's own admissions and actions after the crime. The jury's verdict on these charges is not so contrary to the evidence as to shock one's sense of justice. For the above listed reasons, this issue on appeal should be denied.

**Victim's Mental Health:**

Defendant's third issue on appeal alleges that "[t]he trial court abused its discretion by issuing a pre-trial ruling precluding Mr. Fratangeli from cross-examining the complaining witness regarding her medications and mental health diagnosis, which were relevant to her ability to perceive, remember, and recall." On December 7, 2020, Defendant filed a Motion to Compel Discovery seeking the victim's "most recent mental diagnosis, prescriptions, and psychiatric records." He alleged that three medications the victim was prescribed at the time of the incident are used to treat a variety of mental disorders. He argued that the victim's mental illness has a direct impact on her ability to perceive, remember, and reflect on her surrounding experiences and that the interest of justice required the records to be provided to him.

The Commonwealth filed a response on July 15, 2021 and stated that the victim underwent a rape kit examination after the incident. Included in the standard paperwork for the rape kit is a section entitled "Patient's History/Initial Assessment." It lists the victim's past medical history, including conditions and medications taken regularly at the time of the assault. This was provided to Defendant in discovery. The Commonwealth argued that Pa.R.Crim.P. 573(B)(1)(a) required them to turn over any evidence favorable to the accused that is material either to guilt or punishment and is within the possession or control of the attorney for the Commonwealth. The Commonwealth

stated that they did not have any mental health records, psychiatric records, or any other information regarding the victim's mental health and cannot be compelled to provide what it does not have. The Commonwealth further noted that pursuant to the protections provided by the Mental Health Procedures Act and the Psychiatrist/Psychologist-Patient privilege, said records may be potentially privileged. Absent the victim's consent to disclose the records, neither she nor the Commonwealth could be compelled to produce the records.

Oral argument was held on February 9, 2021. At the hearing, defense counsel set forth that he needed the records because "it's not feasible for me to ask on cross-examination, M.C. ███████, you know, you indicated these medications, because you know, there's no expert to testify. The jury won't know as a lay person what those medications are used for." (N.T., 2/9/21, p.5). Defense counsel cited Commonwealth v. Davido, 106 A.3d 611, 637 (Pa. 2014) and Commonwealth v. Mason, 518 A.2d 282 Pa.Super. 1986), for the proposition that when a witness suffers from mental disability relevant to the ability to accurately observe or recall events, the jury must be at least informed of the disability.

Thereafter, defense counsel set forth the following argument: "Again, we're kind of - - I'm not gonna say, hey, M.C. ███████, you know, aren't you diagnosed with depression or bipolar? That's inappropriate. We all know that. It would be just for the possibility of just seeing what she's diagnosed with, just to figure it out. And if it is something severe, then I think the jury is entitled to hear that to understand this is - - this is what she is afflicted with, obviously something for the jury to consider." (N.T., 2/9/21, p.13).

57

On February 10, 2021, an Order was entered denying Defendant's request for the victim's most recent mental diagnosis, prescriptions and psychiatric records. In open court on March 4, 2021, the Commonwealth filed a Motion in Limine and Motion for Reciprocal Discovery. The reciprocal discovery request is not applicable to the issue on appeal. However, the Motion in Limine anticipated that defense counsel planned to question the victim at trial regarding the medications she listed on the rape kit's History/Assessment page. The Commonwealth argued that given the nature of the medications listed, the disclosure of the medication names and purposes would convey irrelevant and potentially prejudicial information about the victim's medical history to the jury.

The Commonwealth had the following three requests: that defense counsel be instructed to avoid any and all questions regarding the medications except generic questions regarding whether any medications she was taking influenced her ability to perceive or recall the incident; defense counsel be prohibited from raising any diagnosis listed in the victim's History/Assessment form; and because the nature of the medications and diagnoses are irrelevant and of a privileged nature, those contents should be redacted from the copies of the records to be admitted into evidence and published to the jury.

A hearing was held on March 15, 2021. Despite the Court's February 10, 2021 ruling, it is apparent that the defense was given medical records regarding the victim's mental health. Defense counsel stated in part, "And we found out, based on the medical records that we just received, that she's - - that she's diagnosed bipolar one."

58

(N.T., 3/15/21, p. 7).  The following exchange took place between defense counsel and the Court regarding the Commonwealth's Motion in Limine:

MR. BLOOMDAHL: Your Honor, regarding the first one, medications and illnesses, I think any sort of questions related to her ability to reflect and recall on the information.  So those are standard questions that you ask any defendant in a – in a colloquy.  The only thing that we would be doing is to ask do any medications or illnesses affect your ability to recall and reflect information.  And we found out, based on the medical records that we just received, that she's – that she's diagnosed bipolar one.  So I can't really get into it, but what I would ask is does that normally affect your ability to recall and reflect.  And those are standard questions that are asked in any colloquy.  I think the jury is entitled to hear that.

THE COURT: Excuse me.  So you're asking just to be able to ask those broad questions without any records to any – medical records or any medications she's taking?

MR. BLOOMDAHL: I don't think I can because I'm not an expert in that.  I just don't think that would be proper because I can't analyze what specific – what a specific medication might do to somebody.  I don't know.

THE COURT: So you are asking to bring those things in.

MR. BLOOMDAHL: Yes, Your Honor, but in a general sense, not to say, okay, this – this affects your ability, does this normally affect your ability, something like that.  I can't – I can't say that for certain because I'm not an expert.  I don't have an expert ready to testify to that.  That's the first one.

. . .

THE COURT:

. . .

And then on the first motion, I am going to grant the Commonwealth's motion.  So there will be no mention of the names of any medications or any diagnosis, mental health diagnosis.  You can ask a broad question, such as whether or not you're on any drugs that would interfere with your ability to understand the questions, or something like that, but not to bring up what medication she's on or what mental health diagnosis she has.

Do you need any further clarification or my ruling on that?

MR. BLOOMDAHL: No, Your Honor.  I think that's very clear.

THE COURT: All right.  Any further clarification?

MS. WRIGHT: With regard to the medications, in light of the fact they are prescribed medications, I would ask that defense

59

counsel refer to them as medications and not as drugs because there could be confusion that he's talking about street drugs.

THE COURT: Well, he has the right to ask her whether she's on street drugs too while she's testifying, but he can't get into what her medications are. I'm assuming she's going to answer that there aren't any that would make her unable to understand the questions that he's asking.

MS. WRIGHT: Yes, Your Honor.

THE COURT: And that will be the end of that.

(N.T., 3/15/21, pgs. 6-8 and 11-12).

Defendant's argument on appeal is that the Court precluded him from cross-examining the victim regarding her medications and mental health diagnosis. This is not accurate. While the Court did rule that the names of the medications and her mental health diagnosis could not be revealed, the Court also ruled that the victim could be questioned about any drugs or medications that she was taking at the time of the incident and trial that could affect her ability to perceive, remember, recall, and testify about the events. This was consistent with defense counsel's request as placed on the record.

A review of the record also reveals that admitted Exhibit C-10 was actually not redacted and included the names of the four medications and the victim's unredacted past medical history of depression and psoriasis. A review of the victim's trial testimony reveals that she was not questioned, even generally, about any drugs or medications that she was taking at the time of the incident and trial that could affect her ability to perceive, remember, recall, and testify about the events. It is assumed that Defendant abandoned this line of questioning as he saw how well the victim was able to recall and clearly testify about the events leading up to, during, and after the incident.

60

Initially, Defendant relied on the case of Commonwealth v. Davido, *supra*. The Davido Court noted that "[w]hen a witness suffers from a mental disability relevant to his or her ability to accurately observe, recall or report events, the jury must be informed of the disability in order to assist it in properly assessing the weight and credibility of the witness's testimony." 106 A.3d at 637, citing Commonwealth v. Rizzuto, 777 A.2d 1069, 1082 (Pa. 2001), *abrogated on other grounds*. "The evidence can be said to affect credibility when it shows that the witness's mental disorganization impaired his or her capacity to observe an event at the time of its occurrence, to maintain a clear recollection of it, or to communicate the observation accurately and truthfully at trial." Id. The Davido Court determined that the appellant was not entitled to relief because he failed to show that either challenged witness had an impaired ability to accurately observe, recall, or report events due to a mental illness. 106 A.3d at 637. "Only mental health disabilities that impair a witness's ability to observe, recall, or report events, are relevant and admissible to impeach a witness's credibility." 106 A.3d at 637, citing Rizzuto, *supra*. Defendant in the case at hand is similarly situated. Defendant failed to show that the victim was unable to accurately observe, recall or report events due to a mental illness.

Therefore, the Court did not abuse its discretion in its pretrial ruling. The disclosure of the medication names and the victim's mental health diagnosis was not relevant and properly excluded. Defendant's issue on appeal is without merit.

**Publication of the SANE Document:**

Defendant's fourth issue on appeal is that "[t]he trial [C]ourt erred by precluding Mr. Fratangeli from publishing pages 9 and 10 of the Sexual Assault Nurse Examiner

61

('SANE') documentation, which related to injuries, to the jury. N.T., March 17, 2021, at 51. The Court further erred by not allowing the sane documentation to be provided to the jury during their deliberations after the jury requested to see it. N.T., March 17, 2021, at 225."

Pennsylvania Appellate Courts must "review all matters touching upon the admission of evidence, including the trial court's gatekeeping function regarding what evidence a jury gets to observe and handle during a trial, for an abuse of discretion." Commonwealth v. Ali, 112 A.3d 1210, 1217 (Pa.Super. 2015), overruled on other grounds, 149 A.3d 29 (Pa. 2016), citing Commonwealth v. Brown, 52 A.3d 1139, 1197 (2012) and Commonwealth v. Dupre, 866 A.2d 1089, 1102 (Pa.Super. 2005). "'An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record.'" Ali, 112 A.3d at 1217, quoting Commonwealth v. Mendez, 74 A.3d 256, 260 (Pa.Super. 2013), appeal denied, 87 A.3d 319 (Pa. 2014). "'If in reaching a conclusion the trial court over- rides [sic ] or misapplies the law, discretion is then abused and it is the duty of the appellate court to correct the error.'" Ali, 112 A.3d at 1217-1218, quoting Commonwealth v. Weakley, 972 A.2d 1182, 1188 (Pa.Super. 2009).

The Ali Court noted that Pennsylvania case law is sparse concerning the standards that must be applied to a trial court's decision to prohibit a defendant from displaying to the jury a particular exhibit. 112 A.3d at 1218. "Nonetheless, our Supreme Court has articulated the following standard with regard to the items that a jury may take with it into the deliberation room: 'The underlying reason for excluding certain

62

items from the jury's deliberations is to prevent placing undue emphasis or credibility on the material, and de-emphasizing or discrediting other items not in the room with the jury. If there is a likelihood the importance of the evidence will be skewed, prejudice may be found; if not, there is no prejudice per se and the error is harmless.'" Ali, 112 A.3d at 1218, quoting Commonwealth v. Strong, 836 A.2d 884, 888 (Pa. 2003). The Ali Court stated, "[a]lthough not directly applicable, we nonetheless find the standard helpful, and we discern no meaningful basis to distinguish between publication to a jury of an exhibit and providing the jury with that exhibit during deliberations." Id.

Applying the above standard to the case at hand, the Court did not abuse its discretion by prohibiting Defendant from publishing two pages of thirty-four page medical document to the jury and in denying the jury's request to have the document during deliberations. The sexual assault nurse examiner, Lindsay Shannon, testified extensively about the SANE document during direct, cross, and redirect examination. The information found on pages nine and ten of the SANE document addresses injuries to the body and injuries to the genitalia. Ms. Shannon specifically testified that there were no marks, scratches, bruising, or tenderness on the victim's body, including her vagina and vaginal area. (N.T., 3/17/21, pgs. 50-51).

The jury heard the testimony about the lack of observable injuries on the victim's body from both Ms. Shannon and the victim herself. There was no need to highlight the two pages of the thirty-four page report more than the remainder of the evidence. The jurors were well-informed about the document, rendering the alleged error in precluding them from handling or observing the document first-hand relatively inconsequential.

63

Defense counsel also highlighted the lack of physical injuries in his closing argument. (N.T., 3/17/21, p. 173).

It must also be noted that while there were many relevant items gleaned from the SANE document that was brought out through testimony, there were a multitude of other irrelevant and private items contained in the document that would be improperly before the jury if published. These items include the victim's date of birth, allergies, past medical history, medications, last menstrual period, vaccines, suicidal ideations, and six photos of the victim, including four up-close photos of her vaginal, anal, and buttocks areas. Therefore, it was proper for the Court to deny the jury's request to have the SANE document during deliberations, and Defendant's issue on appeal is without merit.

**Jury Instruction:**

Defendant's fifth issue on appeal is that the Court committed an error of law and/or abused its discretion when it instructed the jury as follows: "The Commonwealth alleges that the victim's complaint was prompt. The victim's hue and cry is thought to follow a sexual assault like smoke follows fire. Proof of the former is circumstantial evidence of the latter. Conversely, unexplained lack of evidence of hue and cry that one might expect to ensue from sexual activity[1] may cast doubt on the existence of the assault itself. Fresh complaints of sexual assaults undetailed are a particular form of hue and cry that provide significant circumstantial support for the alleged victim's subsequent testimony that she was sexually assaulted."

While the charge conference between the Court and the attorneys was not recorded, it is clear from the record that there was a dispute between the parties as to

---

[1] Defendant quotes the Court as having used the word "activity," however, a review of the transcript reveals that the Court used the word "assault" in this footnoted place.

64

whether or not the victim's report of the incident was prompt. The Commonwealth requested a prompt complaint jury instruction in their written Proposed Jury Instructions. Defendant's written Proposed Points for Charge did not ask for standard instruction 4.13A, Failure to Make Prompt Complaint in Certain Sexual Offenses. However, it is presumed that he either orally requested this instruction, or his argument that the victim did not make a prompt complaint resulted in the Court giving standard instruction 4.13A along with a prompt complaint instruction. Following the jury charge given by the Court, defense counsel noted his "objection to the hue and cry instruction that was given regarding a prompt complaint." (N.T., 3/17/21, p. 223).

When a party proposes a jury charge, the Court must determine whether the charge is warranted by the evidence presented in the case. Commonwealth v. Billings, 793 A.2d 914, 916 (Pa.Super. 2002), app. denied, 805 A.2d 519 (Pa. 2002), citing Commonwealth v. Mays, 675 A.2d 724 (Pa.Super. 1996). A trial court may only instruct the jury on the legal principals which are applicable to the evidence presented at trial. Commonwealth v. Vaglica, 673 A.2d 371, 373 (Pa.Super. 1996). While a trial judge has broad discretion in phrasing jury instructions and is not bound to give them in the form requested by the defendant, the "instruction must adequately, accurately and clearly present the law to the jury and must be sufficient to guide the jury in its deliberations." Commonwealth v. Jones, 672 A.2d 1353, 1357-1358 (Pa.Super. 1996), citing Commonwealth v. Faulkner, 595 A.2d 28 (Pa. 1991), cert. denied, 503 U.S. 989, 112 S.Ct. 1680, Commonwealth v. La, 640 A.2d 1336 (Pa.Super. 1994), Commonwealth v. Alvin, 516 A.2d 376 (Pa.Super. 1986), appeal denied 529 A.2d 1078, Commonwealth v. Larkins, 489 A.2d 837 (Pa.Super. 1985).

65

The Pennsylvania Supreme Court noted that "[u]nder common law, the promptness of a complaint or the 'hue and cry' was considered an element for a jury to consider when weighing the veracity of a complainant." Commonwealth v. Snoke, 580 A.2d 295, 300 (Pa. 1995), citing Commonwealth v. Allen, 19 A. 957 (Pa. 1890) and Commonwealth v. Krick, 67 A.2d 746 (Pa.Super. 1949). "The theory is based on the principle that a victim of a violent assault would be expected to complain of the assault at the first safe opportunity." Snoke, 580 A.2d at 300, citing Commonwealth v. Lane, 555 A.2d 1246 (Pa. 1989), Commonwealth v. Green, 409 A.2d 371 (Pa. 1979), Commonwealth v. Stohr, 522 A.2d 589 (Pa.Super. 1987), Commonwealth v. Freeman, 441 A.2d 1327 (Pa.Super. 1982). The Snoke Court noted that this principle was codified in the crimes code at 18 Pa.C.S. § 3105 as follows: "Prompt reporting to public authority is not required in a prosecution under this chapter: Provided, however, that nothing in this section shall be construed to prohibit a defendant from introducing evidence of the alleged victim's failure to promptly report the crime if such evidence would be admissible pursuant to the rules of evidence." Snoke, 580 A.2d at 300.

"It has been said that 'hue and cry follow rape like smoke follows fire.'" Snoke, 580 A.2d at 300, citing Freeman, 441 A.2d at 1131. "The presumption follows that if a complaint is made promptly after the alleged offense, the victim has not had time to fabricate the story and the story is given more credibility." Snoke, 580 A.2d at 300, citing Krick, supra. "Conversely, if a complaint is delayed substantially without any reasonable explanation, an inference can be drawn regarding the credibility of that complaint and against whether the incident in fact occurred." Snoke, 580 A.2d at 300. "'Unquestionably, a prompt complaint is a factor which must be assessed with all of the

66

other pertinent evidence bearing upon the question of the credibility of the complaining witness.'" Snoke, 580 A.2d at 301, quoting Commonwealth v. Lane, 555 A.2d 1246, 1250 (Pa. 1989). "'The lack of a prompt complaint by a victim of a crime, although not dispositive of the merits of the case, may justifiably produce a doubt as to whether the offense indeed occurred, or whether it was a recent fabrication by the complaining witness.'" Id.

As set forth above, the evidence in the case at hand was that after the August 15, 2018 incident, Defendant got dressed and left the victim's house between 5:45 p.m. and 6:00 p.m. The victim and Defendant had a text exchange between 6:26 p.m. and 6:30 p.m. The victim testified that the next thing she did was call her friend Brian. Thereafter, between 7:00 p.m. and 7:30 p.m., she called her best friend Joan and told her what happened. She spoke to Joan a second time that night and they then went to Paoli Hospital at 11:00 p.m., about five or six hours after she met Defendant. The police arrived at the hospital and took her statement. She left the hospital about 6:00 a.m. Joan Koehler's testimony differed from the victim's testimony in that she testified that that the victim called her for the first time at approximately 9:30 p.m. and called her the second time at 11:00 p.m. Testimony from nurse Lindsay Shannon revealed that the victim was admitted at 12:17 a.m. on August 16, 2018.

Being that the timing of the victim's first report of the incident was a question of fact for the jury to resolve and whether or not the victim made a prompt complaint, it was appropriate for the Court to give both the prompt complaint instruction and the failure to make a prompt complaint instruction. The Court instructed the jury as follows:

> And I have some instructions regarding prompt complaint in certain sexual offenses.

67

Before you may find the defendant guilty of crimes charged in this case, you must be convinced beyond a reasonable doubt that the act charged did in fact occur and that it occurred without the victim's consent.

The evidence of the alleged victim's failure to complain or delay in making a complaint does not necessarily make her testimony unreliable, but may remove it from the assurance of reliability accompanying the prompt complaint or outcry that the victim of a crime such as this would ordinarily be expected to make. Therefore, any failure to complain or any delay in making a complaint should be considered in evaluating her testimony and in deciding whether the act occurred at all or with or without her consent.

You must not consider the alleged victim's failure to claim – make a claim or delay in making a complaint as conclusive evidence that the act did not occur, or that it did occur but with her consent. The alleged victim's failure to complain promptly and the nature of any explanation for a failure to make a complaint promptly are factors bearing on the believability of her testimony and must be considered by you in light of all of the evidence in the case.

The Commonwealth alleges that the victim's complaint was prompt. The victim's hue and cry is thought to follow a sexual assault like smoke follows fire. Proof of the former is circumstantial evidence of the latter. Conversely, unexplained lack of evidence of hue and cry that one might expect to ensue from sexual assault may cast doubt on the existence of the assault itself. Fresh complaints of sexual assaults undetailed are a particular form of hue and cry that provide significant circumstantial support for the alleged victim's subsequent testimony that she was sexually assaulted.

(N.T., 3/17/21, pgs. 212-214). The language of the instruction was taken from the case law on prompt complaint and mirrored standard instruction 4.13A, Failure to Make Prompt Complaint in Certain Sexual Offenses. These instructions thoroughly informed the jury of the status of the law and allowed the jury to apply their findings of fact regarding whether or not the victim made a prompt complaint. The instructions adequately, accurately, and clearly presented the law to the jury and were more than

68

sufficient to guide the jury in its deliberations. Accordingly, Defendant's allegation on appeal must be denied.

**Defendant's Silence at Sentencing:**

Defendant's sixth issue on appeal alleges that the Court improperly considered Defendant's silence at sentencing as failure to accept responsibility and show remorse. We disagree. Defendant raised this issue in his Post-Sentence Motion. He relied on the case of Commonwealth v. Bowen to support this sentencing allegation. 975 A.2d 1120 (Pa.Super. 2009). The Bowen Court held "that a court may not consider a defendant's silence at sentencing as indicative of his failure to take responsibility for the crimes of which he was convicted." 975 A.2d at 1121. The Bowen Court further held "that silence at sentencing may not be the sole factor in determining a defendant's lack of remorse." Id.

Defendant's reliance on Bowen was misplaced in the case at hand. In Bowen, the defendant invoked his constitutional right not to testify during his jury trial and also maintained his silence at sentencing. Id. The Bowen trial court, in imposing a sentence in the aggravated range, cited multiple factors, including that the defendant "failed to show any remorse for his crime or to take responsibility for them, even after the jury's decision." 975 A.2d at 1121-22. On appeal, the defendant argued that the trial court violated his Fifth Amendment rights by considering his silence as proof of his lack of remorse and then consider it as an aggravating factor in sentencing. 975 A.2d at 1122. The Bowen Court stated that "it is undoubtedly appropriate for a trial court to consider a defendant's lack of remorse as a factor at sentencing, provided that it is specifically considered in relation to protection of the public, the gravity of the offense, and the

69

defendant's rehabilitative needs." 975 A.2d at 1125 citing Commonwealth v. Begley, 780 A.2d 605, 644 (Pa. 2001).

Bowen is distinguishable from the case at hand, as Defendant did not invoke his right to remain silent at his trial or sentencing hearing. The Court heard Defendant's testimony at trial, which attempted to persuade the jury that the sexual assault was consensual. This testimony was contrary to the texts Defendant sent to ~~Ms. Cooper~~ M.C. after the rape and the recorded phone call in which he repeatedly asked ~~Ms. Cooper~~ M.C. for forgiveness, specifically begging her "on everything I have." At that point Defendant was crying and seemed scared that perhaps ~~Ms. Cooper~~ M.C. would take some action.

Defendant also spoke at the sentencing hearing. The following exchange took placed between the Court and Defendant:

THE COURT: Good afternoon, sir. You're not required to say anything but is there anything you would like to say?

MR. DOMINIC FRATANGELI: In regards to the charges and everything in the matter, my lawyer advised me not to speak on my behalf but I would like to speak on something else if that's possible, Your Honor.

THE COURT: Go ahead.

MR. DOMINIC FRATANGELI: With that said, with my attorney, what he stated is that I would be a fit for veterans. As far as coming through the criminal justice system, even through the mental health system, because that's one thing about us veterans, it's hard to understand us unless you've actually been there and been through it.

The nightmares. You know, the night sweats. You know, thinking about tomorrow, what tomorrow is going to be. And I --

THE COURT: I'm here for sentencing --

MR. DOMINIC FRATANGELI: No. No. I know that.

THE COURT: -- on serious charges --

MR. DOMINIC FRATANGELI: Yes. Yes, Your Honor.

THE COURT: -- that you've been convicted of --

MR. DOMINIC FRATANGELI: Yes.

THE COURT: -- Is there anything you'd like to say?

70

MR. DOMINIC FRATANGELI: Yeah. I applied to be a mentor in the Veterans' Court. So I just wanted to state that; that I'm looking forward to being a part of that. That's all.

THE COURT: Thank you.

(N.T., 7/7/21, pgs. 14-16).

Prior to sentencing, the Court made the following statement:

I have considered everything that has been offered here. I've considered the very serious nature of the charges and the devastating impact of that behavior on the victim of this crime.

I have considered the fact that the defendant is a veteran of our military and did very good things for our country during his time of service. I've considered the fact that the defendant has no prior criminal history.

And trying to balance out the very serious nature of the crime, the fact that there's apparently no remorse that the defendant would like to express. No words to apologize to the victim, but rather just to talk about what he would like to do in the future, trying to balance all of that and the sentencing guidelines, which I have considered.

I have considered that there's no prior criminal history of the defendant.

(N.T., 7/7/21, pgs. 17-18). Sentencing Judge Cody set forth the following in the November 15, 2021 Opinion: "This Court noted as an observation what Defendant spoke about at the time of allocution and what he was silent about. Even though this Court could have properly considered his lack of acceptance of responsibility and remorse as one of many factors when imposing the sentence, we can unequivocally state that Defendant's words or lack of words were not held against him and it did not alter his sentence in any way. The sentence imposed is consistent with the protection of the public, took into account the gravity of the offense as it relates to the impact on the life of the victim and on the community, and considered Defendant's rehabilitative needs pursuant to 42 Pa.C.S.A. § 9721(b). Therefore, Defendant's claim that this Court

71

improperly considered Defendant's silence at sentencing is without merit." This issue on appeal should be dismissed.

**Illegal Sentence:**

Defendant's seventh and final issue on appeal alleges that his sentence is illegal because the two counts of aggravated indecent assault should have merged with rape, involuntary deviate sexual intercourse, and sexual assault. Defendant references the Court's answer to the following jury question: "Can you clarify the difference between the duplicate charges 4 & 5 and 6 & 7?" (Court Exhibit 3). The following took place in open court to address the question:

> THE COURT: You may be seated.
> Ladies and Gentlemen, I have another question which reads:
> Can you clarify the difference between the duplicate charges four and five and six and seven?
> Counts four and five are both aggravated indecent assault and six and seven are indecent assault.
> The Commonwealth is alleging that there were two counts of indecent assault. One was while the parties were in the alleged victim's car, and one was when the parties were at the alleged victim's house. So those are two separate factual patterns.
> And on the two counts of aggravated indecent assault, the Commonwealth is alleging that there were at least two separate types of sexual assault. One included oral sex being performed on the victim, and one included vaginal sex being performed on the victim.
> Does that answer the question?
> THE FOREPERSON: Is that – is the first one four and five and the last one six and seven, or was it the other way?
> THE COURT: The indecent assault, those are six and seven. One is alleged to be in the car, and one is alleged to be at the house.
> And you have a copy of my instructions to you. So I encourage you to reread those to make sure that you understand the differences there and what the requirements are.
> If you have any other questions, please write them down, and we will have you brought in.
> Thank you. You are excused.

72

(N.T., 3/18/21, pgs. 6-7).

It must first be noted that Defendant was not given a sentence for sexual assault since the count of sexual assault merged with both rape and involuntary deviate sexual intercourse for sentencing purposes. Therefore, Defendant's claim that aggravated indecent assault should have merged with sexual assault is baseless. Next, it must be noted for clarity purposes that on both counts of aggravated indecent assault, Defendant was given a sentence of two to four years incarceration, to be served concurrently with the rape count and the involuntary deviate sexual intercourse count. Therefore, even though the aggravated indecent assault crimes did not merge with other crimes for sentencing purposes, Defendant is not serving any additional incarceration time for those two counts.

Pennsylvania Appellate Courts have established that "the law of merger is well settled that if an actor commits multiple criminal acts, even as a part of a single criminal episode, the actor will be guilty of multiple crimes which do not merge for sentencing purposes." Commonwealth v. Montgomery, 687 A.2d 1131, 1138-1139 (Pa.Super. 1986), citing Commonwealth v. Ashe, 21 A.2d 920, 921 (Pa. 1941), and Commonwealth v. Richter, 676 A.2d 1232, 1236 (Pa.Super. 1996). Appellate review of an illegal sentence claim based on merger is a question of law and, as such, the scope of review is plenary and the standard of review is de novo. Commonwealth v. Ousley, 21 A.3d 1238, 1242 (Pa.Super. 2011).

The Judicial Code provides: "No crimes shall merge for sentencing purposes unless the crimes arise from a single criminal act and all of the statutory elements of one offense are included in the statutory elements of the other offense. Where crimes

73

merge for sentencing purposes, the court may sentence the defendant only on the higher graded offense." Ousley, 21 A.3d at 1242-1243, quoting 42 Pa.C.S.A. § 9765. Courts must assess a "merger issue by examining 'whether the charges arose out of a single set of facts and whether all the statutory elements of one offense coincide with the statutory elements of the other offense.'" Ousley, 21 A.3d at 1242-1243, quoting Commonwealth v. Lomax, 8 A.3d 1264, 1267–68 (Pa.Super. 2010).

In conducting an analysis to determine whether the sentences for two crimes should have merged, the threshold question is whether the defendant "committed one solitary criminal act. The answer to this question does not turn on whether there was a 'break in the chain' of criminal activity. Rather, the answer turns on whether 'the actor commits multiple criminal acts beyond that which is necessary to establish the bare elements of the additional crime.' If so, then the defendant has committed more than one criminal act." Ousley, 21 A.3d at 1243. "This focus is designed to prevent defendants from receiving a 'volume discount on crime' of the sort described in our Supreme Court's decision in Anderson: 'If multiple acts of criminal violence were regarded as part of one larger criminal transaction or encounter which is punishable only as one crime, then there would be no legally recognized difference between a criminal who robs someone at gunpoint and a criminal who robs the person and during the same transaction or encounter pistol whips him in order to effect the robbery. But in Pennsylvania, there is a legally recognized difference between these two crimes. The criminal in the latter case may be convicted of more than one crime and sentences for each conviction may be imposed where the crimes are not greater and lesser included offenses.'" Ousley, 21 A.3d at 1243, quoting Commonwealth v. Anderson, 650 A.2d 20,

74

22 (Pa. 1994), citing Commonwealth v. Robinson, 931 A.2d 15, 24–25 (Pa.Super. 2007) (en banc) and Commonwealth v. Williams, 958 A.2d 522, 527 (Pa.Super. 2008) (holding that, if the offenses stem from two different criminal acts, merger analysis is not required).

On appeal, Defendant only challenged the sufficiency of the evidence for the forcible compulsion element of the crimes of rape and involuntary deviate sexual intercourse. Defendant does not challenge the remaining elements of the rape and involuntary deviate sexual intercourse crimes, nor does he allege that there was insufficient evidence for the two counts of aggravated indecent assault. Therefore, he acknowledges that the facts were sufficient for his conviction. As discussed above, this Court determined that the forcible compulsion element was also met.

Applying the above analysis to the record in the instant matter, it is clear that all the statutory elements of aggravated indecent assault do not coincide with the statutory elements of the other offenses of rape and involuntary deviate sexual intercourse. Defendant was convicted of rape under 18 Pa.C.S.A. § 3121(a)(1) that states that "[a] person commits a felony of the first degree when the person engages in sexual intercourse with a complainant...[b]y forcible compulsion." Defendant was convicted of involuntary deviate sexual intercourse under 18 Pa.C.S.A. § (a)(1) that states that "[a] person commits a felony of the first degree when the person engages in deviate sexual intercourse with a complainant ... [b]y forcible compulsion." Defendant was convicted of two counts of aggravated indecent assault under 18 Pa.C.S.A. § 3125(a)(1), (2) that states in part that "a person who engages in penetration, however slight, of the genitals or anus of a complainant with a part of the person's body for any purpose other than

75

good faith medical, hygienic or law enforcement procedures commits aggravated indecent assault if: (1) the person does so without the complainant's consent; [or] (2) the person does so by forcible compulsion."

Most importantly, it must be noted that the jury found Defendant guilty under both subsections (a)(1) and (a)(2) on both counts of aggravated indecent assault. If Defendant was found guilty under only subsection (a)(2), acting by forcible compulsion, Defendant may have had a stronger merger argument. However, the element of the Defendant acting "without the complainant's consent" under subsection (a)(1) is an element not found in rape or involuntary deviate sexual intercourse. Since all of the statutory elements of aggravated indecent assault are not included in the statutory elements of the other offenses, the crimes do not merge for sentencing purposes. Defendant's issue on appeal is without merit and must be dismissed.

BY THE COURT:

_____
ANALISA SONDERGAARD,     J.

DATE: 3/10/22

76